**UNITED STATES of America, Plaintiff–Appellee,**

v.

**MICHAEL R., Defendant–Appellant.**

No. 95–10442.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 17, 1996.

Decided July 8, 1996.

Paul Scott Simon, Tucson, Arizona, for defendant-appellant.

Jesse J. Figueroa, Assistant United States Attorney, Tucson, Arizona, for plaintiff-appellee.

Before: PREGERSON and TROTT, Circuit Judges, EZRA, District Judge.*

DAVID ALAN EZRA, District Judge:

This appeal presents a constitutional challenge to the juvenile handgun possession law, 18 U.S.C. § 922(x)(2). The question of constitutionality under the Commerce Clause is one of first impression in the Ninth Circuit, indeed in any court of appeals. Also on appeal here is the trial court's denial of appellant's suppression motion. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294. We AFFIRM.

I.

On June 23, 1995, Clayton Alan Kidd ("Kidd"), a Lieutenant with the Tucson Police Department, was on patrol in a relatively high crime area; he was working in conjunction with the Community Response Team ("CRT"), a special unit established to monitor gang activity in Tucson. Kidd was working "plainclothes," wearing jeans and a T-shirt and driving an unmarked white Ford Taurus.

At around 10:30 p.m., while driving through a Quik–Mart parking lot at the corner of 29th and Craycroft Streets, Kidd saw a small white pickup, with two people in the cab, driving towards him. Both the driver and passenger of the pickup made eye contact with Kidd. Kidd noticed that they were

---

* Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.

Hispanic males with very short, almost shaven hair. A nine-year veteran on the police force, Kidd suspected from their appearance and demeanor that the occupants of the truck might be gang members.

Kidd contended that the occupants of the pickup began to "mad-dog" him, which is a stern expression that Kidd understood to be a prelude to violence in the local teenage gang culture. Kidd testified that in his experience as a police officer, he knew of young people who had been shot as a result of this type of activity.

When Kidd exited the parking lot on Craycroft, the white pickup pulled out into traffic close behind him. Kidd made several turns and the white pickup followed. Kidd called for back-up surveillance of the pickup truck, notifying his counterpart that a vehicle was following him and may need to be stopped.

As Kidd was driving up Woodland Street in a residential section going approximately the speed limit, the pickup tried to pass him on the left. Kidd accelerated to prevent the pickup from passing him because he was concerned that he would be in a dangerous position while the cars were adjacent to each other.

Several blocks later, two marked police cars stopped the truck. As the uniformed police officers approached the truck, three individuals lying down in the back of the truck sat up. One of the officers asked the occupants if anybody had any weapons. Several said no; one juvenile named Michael R. (herein referred to as "John Doe" or "Doe") remained silent and put his head down. Per the officer's instructions, the individuals in the back of the truck stepped out one by one; when Doe stepped out of the truck, the officers heard the sound of metal hitting the asphalt. Upon further investigation, they found a small .22 caliber Jennings pistol which had fallen from John Doe's pants and immediately arrested Doe.

The United States Attorney's Office filed an information, charging Doe under the terms of the Federal Juvenile Delinquency Act, for knowingly and intentionally possessing a handgun in violation of 18 U.S.C. § 922(x)(2). Doe moved to suppress the weapon as the fruits of an illegal search. The trial court denied that motion. The trial court also denied Doe's constitutional challenge to the statute, holding that section 922(x)(2) was consistent with Congress's power to regulate commerce. These two rulings are the basis of Doe's appeal.

II.

Doe's challenge to the constitutionality of 18 U.S.C. § 922(x)(2) is based on the Supreme Court's decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held that a statute proscribing possession of firearms in a school zone is beyond Congress's Commerce Clause powers. The district court distinguished *Lopez* from the facts here and found section 922(x)(2) constitutional.[1]

Since the constitutionality of the statute is a question of law, we review the district court's holding de novo. *United States v. Sahhar*, 56 F.3d 1026, 1028 (9th Cir.1995).

Doe argues that the district court ruling is erroneous because section 922(x)(2) intrudes upon state criminal jurisdiction in violation of the Tenth Amendment. Doe contends that section 922(x)(2), like its counterpart section 922(q) which was reviewed in *Lopez*, is unconstitutional because it is a "criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1630–31. Furthermore, Doe maintains that section 922(x)(2) has no "jurisdictional element" which would operate to ensure that, on a case-by-case basis, there was an effect on interstate commerce. *Id.* at ——, 115 S.Ct. at 1631.

The Government defends the statute as a whole: the Government contends that 18 U.S.C. § 922(x) clearly regulates commerce

1. Critical to the trial court's determination that 18 U.S.C. § 922(x)(2) is constitutional were the following: (a) there were legislative findings that section 922(x)(2) was related to interstate commerce; (b) the statute regulated interstate commerce of guns (with the exception of Rugers) not made in Arizona and that come into the state; (c) there is an overall regulatory scheme to try and keep guns out of minors' hands requiring intrastate regulation. *See* Record, Exh. G, at 2–3.

by prohibiting the sale, delivery, and transference of a handgun to a juvenile. The Government argues that section 922(x)(2) is an essential part of a larger, more comprehensive regulation to curb the bustling underground market in firearms and drugs. We agree.

At the outset, we note that the instant constitutional challenge of 18 U.S.C. § 922(x) is a case of first impression; there are no published circuit court cases addressing the constitutionality of this statute.[2] The analysis below therefore relies heavily on comparisons to *Lopez*. Although there are a number of parallels between section 922(q), the statute in *Lopez*, and section 922(x), the statute in question here, there are a few critical distinctions that are pivotal to our holding.

■ The Supreme Court identified three broad categories that Congress can regulate or protect under the Commerce Clause: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce." *Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1629–30. The government concedes, and we agree, that if section 922(x) is to be sustained, it must be under the third category.

In *Lopez*, the Supreme Court held in a narrow decision that the Gun–Free School Zone Act of 1990 (hereinafter "18 U.S.C. § 922(q)" or "section 922(q)") was not a valid exercise of Congress's commerce powers because the activities regulated under that statute were too far removed from interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1634. It stated, "The possession of a gun in a local school zone is in no sense an economic activity that might, through repeti-

tion elsewhere, substantially affect any sort of interstate commerce." *Id.* The Supreme Court also rejected the "costs of crime" and the "national productivity" rationale proffered by the Government as overreaching the breadth of the Commerce Clause. *Id.* at ——, 115 S.Ct. at 1632.

■ 18 U.S.C. § 922(x)(2) is different. First, we note that this statute is part of a larger regulation that deals with the sale, delivery, or transfer of firearms to a juvenile. The parent statute, § 922(x), in relevant part, provides:

(1) It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile-

(A) a handgun; or

(B) ammunition that is suitable for use only in a handgun.

(2) It shall be unlawful for any person who is a juvenile to knowingly possess-

(A) a handgun; or

(B) ammunition that is suitable for use only in a handgun.

18 U.S.C. § 922(x). Read as a whole, § 922(x) by its terms regulates commerce: subsection (1) is targeted at curbing the supply of handguns and suitable ammunition, while subsection (2) restricts the demand for these firearms. We find that under the statute, Congress is in effect regulating interstate commerce by attacking both the supply and demand for firearms with respect to juveniles.

■ Second, we have no doubt that possession of a handgun by a juvenile, as a general matter, could have a substantial effect on interstate commerce. The legislative history[3] indicates that Congress enacted this statute to help control crime "by stopping commerce in handguns with juveniles nation-

---

2. There is, however, one published district court case which addresses this exact issue. *See United States v. Cardoza*, 914 F.Supp. 683 (D.Mass. 1996). The District Court of Massachusetts found that 18 U.S.C. § 922(x) impacts the handgun market by excluding juvenile participation; it concluded that because of § 922(x)'s effects on the supply and demand of handguns, the statute fits within Congress's constitutional authority to regulate commerce. *Id.* at 687.

3. The panel may consider legislative findings, including congressional committee findings regarding the effect on interstate commerce, as part of its independent evaluation of constitutionality under the Commerce Clause. *See Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

wide." House Conf. Rep. No. 103–711, 390–91, 103d Cong., 2d Sess., *reprinted in* 1994 U.S.C.C.A.N. 1858, 1859. Congress defended the enactment of this statute as consistent with the Commerce Clause on three grounds: (a) the movement of the component parts, ammunition, and raw materials in interstate commerce; (b) the deterrence effect of violent crime on the travel of ordinary citizens and foreigners; and (c) the related effort to control gun possession and drug flow. *Id.*

The first two grounds are self-explanatory: possession of a handgun by a juvenile implicates interstate commerce through the manufacturing process and by its deterrent effect on interstate travel. We also find a nexus between this statute and Congress's efforts to control firearms and drug trafficking. In today's drug culture, it is not uncommon for runners to be under 18 years old. And as reflected by the crime statistics, many of them carry guns. It is logical, then, that a statute regulating the sale, transfer, and possession of handguns by juveniles could have a substantial effect in curbing the illegal flow in commerce of drugs and firearms. Congress noted that "[v]iolent crime and the use of illicit drugs go hand-in-hand, and attempts to control one without controlling the other may be fruitless." House Conf. Rep. No. 103–711, 390–91, 103d Cong., 2d Sess., *reprinted in* 1994 U.S.C.C.A.N. 1858, 1859. Furthermore, this circuit recently accepted legislative findings that gun violence affects commerce. *See Mack v. United States,* 66 F.3d 1025, 1028 n. 5 (9th Cir.1995). Giving due deference to the legislative findings here especially because it comports with our common sense understanding of the facts, we hold that there is a sufficient nexus between this statute and interstate commerce for 18 U.S.C. § 922(x)(2) to overcome the instant constitutional challenge.

Accordingly, we AFFIRM the district court's ruling that enactment of section 922(x)(2) is a valid, constitutional exercise of Congressional commerce powers.

## III.

Doe also contends that the investigatory stop in this case was not legally justified and the tainted evidence of the illegal seizure must be suppressed. He argues that the traffic stop was a pretext to allow Kidd and the other officers a chance to gather information and intelligence about gangs in the area. Doe maintains that neither Kidd's articulated facts nor the Arizona state traffic laws provide an objective basis for the stop. *See United States v. Millan,* 36 F.3d 886, 888 (9th Cir.1994).

The Government argues that the police had cause to stop the pickup based on two observed traffic violations and a reasonable suspicion of gang activities. The Government rationalizes the stop under Arizona traffic laws for (a) a speed violation, *see* Arizona Revised Statutes §§ 28–701.02 (speed limit law); *Slavin v. City of Tucson,* 17 Ariz.App. 16, 495 P.2d 141, 144 (1972) (excess speed infraction depends on maximum speed limit and on actual and potential hazards), and (b) unsafe movement in violation of Arizona Revised Statutes §§ 28–721, 723, 725.[4]

The Government also argues that the officers had reasonable suspicion to suspect that a crime may have been committed or was about to be committed. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). The Government contends that viewed as a whole, the circumstances indicate that criminal activity was imminent.

■ "Whether an encounter between an individual and law enforcement authorities constitutes an investigatory stop is a mixed question of law and fact subject to de novo review." *United States v. Kim,* 25 F.3d 1426, 1430 (9th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994). We review factual determinations underlying this inquiry for clear error. *Id.* The specific question of whether reasonable suspicion existed under given facts is a legal conclusion

---

**4.** The Government contends that there is no law that permits a driver to travel in excess of the speed limit to overtake a car and furthermore, driving in excess of the speed limit around a

"dog leg" on a narrow street in a residential section at night is an unsafe maneuver in violation of Arizona Revised Statutes.

subject to de novo review. *United States v. Garcia–Camacho*, 53 F.3d 244, 245 (9th Cir. 1995).

██ To detain a suspect, a police officer must have reasonable suspicion, or "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Garcia–Camacho*, 53 F.3d at 246. To determine whether reasonable suspicion existed, the court must consider the totality of the circumstances surrounding the stop. *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992).

██ The facts are to be interpreted in the light of a trained officer's experience. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. This includes the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." *Hall*, 974 F.2d at 1204 (quoting *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985)). The articulated facts must, however, be more than the mere subjective impressions of a particular officer. *United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989). Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation; a "gloss on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Rodriguez–Sanchez*, 23 F.3d 1488, 1492 (9th Cir.1994).

██ In ascertaining whether the officers acted on reasonable suspicion in the instant case, the court must determine from the totality of the circumstances whether their inference of criminal conduct was based on specific, articulable facts. *See Cortez*, 449 U.S. at 416–18, 101 S.Ct. at 694–95. No single factor is dispositive in this assessment; the issue is whether "taken together they amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989).

██ The record indicates that Lieutenant Kidd based the investigatory stop on the following: (1) it was 10:30 p.m. on a summer night in a relatively high crime area; (2) two young Hispanic males with very short, almost shaven hair, as was a defining characteristic of some of the gangs in that area, were driving a small pickup truck diagonally across a Quik–Mart parking lot; (3) the occupants of the pickup truck gave Lieutenant Kidd a stern expression, commonly known as "mad-dogging" in street culture, as they passed his car; (4) from his experience as a police officer, Kidd knew young people who had been shot as a result of this type of activity; (5) the white pickup followed Kidd's car onto the street and through a number of quick turns; (6) the pickup violated traffic laws in attempting to pass Kidd's car on a residential street.

Viewed as a whole in light of a trained officer's experience, the circumstances here support a finding of reasonable suspicion. Even if some of the factors viewed alone appear innocent, taken collectively, they establish the requisite degree of suspicion to conduct an investigatory stop. *United States v. Malone*, 886 F.2d 1162, 1164 (9th Cir. 1989). For example, the fact that the young men had haircuts that were characteristic of gang members has evidentiary significance under the totality of circumstances analysis. *Id.* at 1165. Also, in light of the Lieutenant's nine years on the police squad and his work with the CRT, the court should give substantial weight to Kidd's deductions that the occupants of the pickup truck stared him down, or "mad-dogged" him in the parking lot. *See Garcia–Camacho*, 53 F.3d at 248. The clincher here, however, is the street game of cat and mouse.

The record shows that the pickup truck pulled out of the Quik–Mart parking lot immediately behind Kidd's Taurus and began following him. The pickup tailed Kidd's car, during several lane changes and several left turns through a residential neighborhood, which ultimately brought the vehicles full-circle back to the intersection of 29th and Craycroft Streets. Along the way on a two-lane residential street, the pickup unsuccessfully attempted to pass Kidd's car. Kidd

accelerated to keep the pickup at bay, because he was concerned that he would be in physical danger if the pickup pulled alongside of his car. This sequence of events clearly gave the officers legitimate cause for concern and for detaining the pickup truck.

Furthermore, in light of the recent Supreme Court decision in *Whren v. United States,* —— U.S. ——, ——–——, 116 S.Ct. 1769, 1772–73, 135 L.Ed.2d 89 (1996), we find that the traffic stop in this case also survives constitutional scrutiny. In *Whren,* the Supreme Court upheld the validity of a search conducted pursuant to a traffic stop where the officer allegedly pulled the car over for failing to give full time and attention to the operation of a vehicle, for failing to give the appropriate signal before turning, and for driving at a speed greater than is reasonable and prudent under the conditions. *Id.* Even though the Supreme Court recognized that the officers in *Whren* were patrolling the area for drugs and were suspicious of drug activity in that particular case, in a unanimous opinion, it dismissed the idea that an ulterior motive might serve to strip the officers of their legal justification to stop the vehicle. Holding that "[s]ubjective intentions [of the officers] play no role in ordinary, probable-cause Fourth Amendment analysis," [5] the Supreme Court effectively "foreclose[ed] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.,* at ——, 116 S.Ct. at 1774.

Under *Whren,* Doe is precluded from challenging the traffic stop based on Kidd's subjective intent. Doe's sole recourse under the Fourth Amendment is to show that the traffic stop was "unreasonable under the circumstances." *Whren,* at ——, 116 S.Ct. at 1772 (internal quotations omitted). This is particularly difficult here because "[a]s a general matter, the decision to stop an automobile is reasonable where police have probable cause to believe that a traffic violation has occurred." *Id.*

Here, officer Kidd observed that the driver was traveling in excess of the speed limit in an attempt to overtake his car around a "dog leg" on a narrow residential street at nighttime. Under these facts, we find that Officer Kidd had probable cause to believe that the Arizona traffic code had been violated. As such, we determine that the traffic stop in this case was reasonable under the circumstances and therefore permissible under the Fourth Amendment.

Overall, the facts articulated here demonstrate that the stop was premised on more than Kidd's mere subjective impressions of criminal activity. The fact that the occupants in the white pickup engaged Kidd in "mad-dogging", followed his car through a series of residential streets, and made an unsafe movement in attempting to pass his car gave the officers justifiable cause to stop and search the vehicle. For these reasons, we conclude that Doe's contention that the stop was pretextual is unwarranted and does not entitle him to Fourth Amendment relief. Accordingly, we AFFIRM the district court's denial of Doe's Motion to Suppress.

---

5. The Supreme Court's ruling in *Whren* nullifies our previous approach to such Fourth Amendment challenges, *see United States v. Robles–Alvarez,* 75 F.3d 559, 561 (9th Cir.1996), of asking whether a reasonable officer under the same circumstances would have made the stop anyway, apart from his or her suspicions about other more serious criminal activities. —— U.S. at ——–——, 116 S.Ct. at 1774–76 .