*718 W. FLETCHER, Circuit Judge,
dissenting:
In his Report and Recommendation, the magistrate judge found that because defendant Mark Willis had already voluntarily stopped his car, Officers Carl Boehmer and D. Miller did not perform a traffic stop under Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Because the magistrate judge found that there had been no traffic stop, he specifically declined “to assess the credibility of the officer’s testimony about Willis’s driving.” The magistrate judge further found that the officers did not have a reasonable suspicion of criminal activity that would justify a stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the magistrate judge found that the stop was justified by the community caretaking function under Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In denying Willis’s motion to suppress, the district court adopted without change the Report and Recommendation.
The majority declines to affirm the district court’s decision based on either Terry or Cady. Instead, it affirms on a ground explicitly rejected by the magistrate judge and the district court — that Officers Boeh-mer and Miller performed a permissible traffic stop under Whren. For two independent reasons, I respectfully dissent.
First, Officer Boehmer was required to present “specific, articulable facts” to support his contention that there was reasonable suspicion that Willis had violated the traffic laws, and thereby to justify a traffic stop under Whren. Terry, 392 U.S. at 21, 88 S.Ct. 1868; United States v. Michael R, 90 F.3d 340, 346 (9th Cir.1996). Despite ample opportunity, he did not do so. Second, Whren applies only to “run-of-the-mine” traffic stops. 517 U.S. at 819, 116 S.Ct. 1769. The stop at issue in this case was anything but “run-of-the-mine,” and therefore does not qualify as a traffic stop under Whren.
I. Facts
Only two people testified at the suppression hearing before the magistrate judge, Officer Boehmer of the Las Vegas Metropolitan Police Department, and defendant Willis. The magistrate judge wrote that he “need not assess the credibility of the officer’s testimony about Willis’s driving” because he found that no traffic stop occurred, given that “Willis voluntarily pulled his car over in front of his own residence before Officers Boehmer and Miller swooped in and surrounded him.” (Emphasis in original.) For purposes of my dissent, I assume that Officer Boehmer testified truthfully about what he saw and thought he saw.
As will be apparent, there are two problems with Officer Boehmer’s testimony. First, as to his justification for the traffic stop, the problem is not with what Officer Boehmer stated. Rather, the problem is what he did not state. That is, Officer Boehmer’s testimony does not contain sufficient “specific, articulable facts” to justify a traffic stop. See Terry, 392 U.S. at 21, 88 S.Ct. 1868, Michael R., 90 F.3d at 346. Second, as to the nature of the stop, Officer Boehmer’s testimony makes clear that his detention of Willis was anything but a “run-of-the-mine” traffic stop. Because it was not such a traffic stop, it cannot be justified under Whren.
A. Willis’s Driving
Early in the morning of December 19, 2002, Willis, an African-American male, was driving a car with Colorado license plates within the city limits of Las Vegas, Nevada. Officer Boehmer testified that he began to follow Willis in a marked patrol car after seeing him make a “rapid turn” *719 from Hoover Avenue right onto Las Vegas Boulevard. Officer Boehmer testified at the hearing that three aspects of Willis’s driving warranted a stop for traffic violations — his “rapid turn” onto Las Vegas Boulevard, his accelerating and speeding after that turn, and his later U-turn on Hoover Avenue. I consider them in sequence.
1. “Rapid Turn”
Officer Boehmer testified that the “rapid turn” onto Las Vegas Boulevard from Hoover Avenue was “more excessive than it should have been,” and that he believed this turn violated the traffic laws. Officer Boehmer elaborated in an exchange with the magistrate judge:
Q: What do you mean that the turn is more excessive than it should have been?
A: Well, the speed is more excessive than I’d say operating speed would be.
Q: All right. What is the traffic code violation?
A: I don’t know, Your Honor.
Q: No citation was issued in this case? A: No.
Q: Do you have any idea what — I mean, is there — this was in the city of Las Vegas and would have been under the — either the state’s—
A: It would have been — -it would have been a municipal traffic code. Yes, Your Honor.
Q: Okay. And you don’t know what the traffic code would be?
A: No, Your Honor. I don’t really write too many tickets.
Q: Okay.
A: I just mostly do criminal investigations.
2. Accelerating and Exceeding the Speed Limit
Officer Boehmer testified that after turning right onto Las- Vegas Boulevard, Willis turned right onto Charleston Boulevard, turned right onto Third Street, and finally turned right back onto Hoover Avenue. The distance on Las Vegas Boulevard between Hoover Avenue and Charleston (ie., between Willis’s first and second turns) is one block. The distance on Charleston between Las Vegas Boulevard and Third Street (ie., between his second and third turns) is two blocks. The distance on Third Street between Charleston and Hoover (ie., between his third and fourth turns) is a block and a half. After his fourth right turn back onto Hoover, Willis parked his car on the south side of the street at or near the northwest corner of Third and Hoover. Willis traveled essentially in a circle, covering a total distance of somewhere between four-and-a-half and five blocks.
On direct, Officer Boehmer testified that he was driving northbound on Fourth Street at the intersection of Fourth and Hoover when he first saw Willis. Officer Boehmer was one block away from Willis, who at that moment was making his “rapid” right turn from Hoover onto Las Vegas Boulevard. Officer Boehmer testified that he turned right onto Hoover toward Las Vegas Boulevard to follow Willis. Then, as Officer Boehmer turned right onto Las Vegas Boulevard from Hoover, he saw Willis — still one block ahead of him — turning right onto Charleston. Officer Boeh-mer testified, “I accelerated to attempt to catch up with the vehicle because it was apparent to me, with the distance he had gained,' he had been accelerating. I' then made a westbound turn onto Charleston, and at the time the vehicle was just beginning to make a turn onto northbound Third Street.” Boehmer testified that in *720 his opinion Willis was trying to evade him. He said, “Just from my experience — my three years experience, in the past people trying to evade me, make rapid continuous turns like that.”
On further questioning by the magistrate judge, Officer Boehmer reiterated his view that Willis’s right turn onto Las Vegas Boulevard had been a traffic violation. He also stated for the first time that, although he could not tell “exactly how fast” Willis was traveling, he was exceeding the speed limit:
Q: [A]s you reached Hoover, to your right you looked and saw this white vehicle making a right turn from Hoover onto Las Vegas Boulevard south-bound? A: Yes. Yes, Your Honor.
Q: A rapid turn?
A: Yes, a rapid turn.
Q: Was it a traffic violation in your judgment?
A: It is. Basically the way he made his turn.
Q: Is that what you thought at the time?
A: Oh, definitely at the time, that’s why I continued to follow him. And then once I made the turn and I observed how far he had gotten from me, the distance that he had gained, he wasn’t going the speed limit. I had, you know, no way to tell exactly how fast, but he wasn’t going the speed limit because I had to accelerate excessively to try to catch up with him.
The magistrate judge sought to clarify the distances (and, by inference, the speeds) involved, asking if Officer Boeh-mer could see Willis after he turned onto Charleston from Las Vegas Boulevard, and then again after he turned onto Third from Charleston:
Q: So you saw him make a right turn on Third [from Charleston]?
A: Yes I did.
Q: And then when you reached Third and made a right turn, do you recall where he was when you were able to see down Third Street?
A: Yes. I believe he was already past Coolidge because I was saying — I remember saying to myself, man, this guy is driving so fa[s]t, you know it was almost to the point I was going to call out the vehicle pursuit, but I had no other description besides the white vehicle.
The distance between Charleston and Third is a block and a half. Coolidge comes into Third at an angle, joining Third half a block up from Charleston. The magistrate judge continued:
Q: And then when you turned north on Third Street, he was already halfway between Coolidge and Hoover?
A: Yes.
Q: He must have been slowing down as he approached Hoover, correct?
A: He did.
Q: And he then made a right turn on Hoover?
A: Yes.
Q: Just around the corner practically— A: Yes.
Q: —and parked—
A: Yes.
Q: On the south side of the street?
A: Yes, Your Honor.
When Willis parked his car, he was less than two blocks from where he had been when Officer Boehmer had first spotted him. He was now back on Hoover, pointed in the same direction he had been driving when he made his “rapid turn” from Hoover onto Las Vegas Boulevard.
Officer Boehmer never testified as to the speed limit on the streets on which Willis *721 traveled, or as to the exact speed Willis was traveling. He also made no attempt to explain how Willis had been able to exceed the speed limit when he never traveled more than two blocks in a straight line. Nor did Officer Boehmer attempt to reconcile his belief that Willis was trying to evade him with the fact that Willis had essentially driven in a four-and-a-half to five-block circle, coming back onto Hoover and then stopping voluntarily.
3. U-Turn on Hoover
After parking his car on Hoover, Willis got out, “sprinted” (Officer Boehmer’s word) across the street to a nearby apartment, and banged on the door. He was admitted to the apartment and stayed for a short time. He then came out of the apartment, got into his car, and made a U-turn on Hoover. He crossed Third Street and stopped the car at the curb on Hoover in front of what we now know was his own apartment.
Officer Boehmer testified that Willis’s U-turn on Hoover was illegal, but he cited no provision of any applicable traffic law. Nevada’s traffic laws provide that “[a] U-turn may be made on any road where the turn can be made with safety, except as prohibited by this section and by the provisions of N.R.S. 484.309 [driving on a divided' highway] and 484.339 [turning on a curve or crest/grade].” Nev.Rev.Stat. 484.337(1) (2002). U-turns may not be performed at stoplights that have signs prohibiting these turns. Id. at 484.337(2). Nor may they be performed in a business district unless at an intersection. Id. at 484.337(3). Las Vegas’s municipal traffic code provides, “The driver of any vehicle shall not turn such vehicle so as to proceed in the opposite direction upon any street in a business district and shall not upon any other street so turn a vehicle unless such movement can be made in safety and without interfering with other traffic.” Las Vegas Mun.Code 11.12.050 (2005).
Nowhere in his testimony did Officer Boehmer state that Hoover Avenue at Third Street is in a business district. We know from Officer Boehmer’s testimony that there were residential apartments along Hoover at the point where Willis made his U-turn. Further, Officer Boeh-mer’s testimony indicates that there was no traffic on Hoover when Willis performed the U-turn. Finally, there is nothing in Officer Boehmer’s testimony to indicate that there was a stoplight or a sign prohibiting a U-turn, or that Willis’s U-turn was unsafe.
4. Other Evidence
Officer Boehmer testified at the suppression hearing that he had no recollection of having mentioned any traffic violations to Willis during the course of the arrest, and that no traffic citation was ever issued to Willis. Officer Boehmer further testified that he did not mention Willis’s rapid accelerating and speeding in either of his two written reports prepared after the arrest. Officer Boehmer did mention Willis’s U-turn in his reports, but only as part of the narrative leading up to Willis’s voluntary stop in front of his own apartment. Officer Boehmer did not indicate anywhere in his two written reports that Willis’s U-turn was illegal. Indeed, there is nothing in either of Officer Boehmer’s two reports to indicate that Willis had violated the traffic laws in any manner, or that Officer Boehmer had stopped Willis for a traffic violation.
B. Circumstances of the “Traffic Stop”
Officer Boehmer’s testimony makes clear that he suspected that Willis was engaged in, or had engaged in, criminal activity. He testified that his suspicions were first aroused by Willis’s manner of *722 driving between the time of his initial turn from, and subsequent return to, Hoover Avenue. His suspicions were further aroused when Willis parked on Hoover, left his windows rolled down, ran across the street, and banged on the door of an apartment. At that point, Officer Boeh-mer asked that a check be run on the Colorado license plates of Willis’s car. He also asked for back-up: “Due to the suspicious situation, the known gang, prostitution and drug activity in the area, I just, for officer safety, I wanted another officer there, and the time of night.” While he waited for his back-up to arrive, Officer Boehmer made a U-turn on Hoover and drove a little over half a block away to the west. He parked in an alley that intersected Hoover between Third Street and Casino Center Boulevard. He testified that he had an unobstructed view from the alley to the apartment complex to which Willis had run.
Officer Boehmer testified that the license plate check revealed that Willis’s car was listed as a “suspicious vehicle in an earlier event almost a week earlier.” It also revealed “that the vehicle has a missing persons [National Crime and Information Center (“NCIC”) ] hit on it.” About a week earlier, the woman who owned the car Willis was driving had been driving with Willis in Las Vegas. They were stopped by Las Vegas police because the car had a missing person listing on the NCIC system. During the stop, Las Vegas police officers learned that the woman was in Las Vegas on her own volition and wanted no assistance. According to Officer Boehmer, the suspicious vehicle report had been entered into the local Las Vegas police department system at about the time of this stop.
Las Vegas police contacted the woman’s family and the Escondido, California Police Department (the -source of the missing person listing) to tell them what they had learned. The Escondido Police Department requested that the Las Vegas Police Department let them know where the woman was so that she could be removed from the missing persons list. The record does not indicate when or if the Las Vegas Police Department responded to this request. However, none of this was known to Officer Boehmer as he watched from the alley. The only thing he knew was that the car was listed as a “suspicious vehicle” on the local Las Vegas system, and there was an NCIC missing persons “hit” on the car.
Officer Miller arrived in a separate police car in response to the back-up request. While Officer Boehmer was describing the situation to Officer Miller, Willis - came back out of the apartment. Willis got into his car, made a U-turn on Hoover, and drove less than a block. Still on Hoover, Willis pulled over to the curb of his own accord and parked in front of his own apartment. Officers Boehmer and Miller immediately moved to box in Willis’s car. Officer Boehmer made a U-turn, turned on his overhead lights, and drove up behind Willis’s car. Officer Miller made a U-turn from the other direction, turned on his overhead lights, and drove up to the front of Willis’s car.
Officer Boehmer testified that Willis opened his car door as he was in the middle of his U-turn. Then, “as he stepped out [of his car] I was putting my vehicle into park and I observed a black male start looking from side to side rapidly.” Boehmer testified, “I immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his pockets because at the time he had his hands in his jacket pockets.... [F]rom my experience again, someone that, you know, immediately opens up their vehicle and jumps out and *723 begins looking from side to side frantically is, in my experience they’ve always taken off running. So before, you know, he had a chance to, I just started giving commands.”
Officer Boehmer testified that Willis complied with his commands. After Willis had walked to the front of the police car, Officer Boehmer asked him, “[D]o you have anything on you I should know about?” According to Officer Boehmer, Willis “said he had a gun.” Officer Boeh-mer says he “then asked him to place his hands behind his back and spread his feet apart[.]” Officer Boehmer testified that Officer Miller “gained [Willis’s] consent” to look in his pockets, where he found a loaded firearm. Officer Boehmer testified that he then gave Willis a Miranda warning and asked him more questions. He testified that he asked a records clerk to run a criminal history check, and that the check revealed that Willis was a convicted felon. Officer Boehmer placed Willis under arrest “[f]or ex-felon in possession of a firearm, carrying a concealed weapon, ex-felon failure to register at that time.” After arresting Willis, Officer Boehmer transported him to the Clark County Detention Center.
II. Discussion
In Whren v. United States, the Supreme Court held that the police may make an ordinary “traffic stop” whenever they have sufficient reason to believe that a traffic law has been violated. It does not matter under Whren that the police might have some ulterior motive for making the stop, so long as they have sufficient reason based on suspicion that the traffic laws have been violated. The Court in Whren spoke of “probable cause,” 517 U.S. at 819, 116 S.Ct. 1769, but we, along with other circuits, have construed Whren to require only that the police have “reasonable suspicion” to believe that a traffic law has been broken. United States v. Lopez-Soto, 205 F.3d 1101, 1104 (9th Cir.2000).
Whren gives the police considerable leeway in making traffic stops, but it does not provide them carte blanche. There are two independent requirements for a valid traffic stop under Whren.
First, “specific, articulable facts” to justify reasonable suspicion must be provided by the police officer. As stated by the Supreme Court in Terry, “the police officer must be able to point to specific, articulable facts which, together with rational interferences from those facts, reasonably warrant [the] intrusion.” Terry, 392 U.S. at 21, 88 S.Ct. 1868 (emphasis added). See also United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996) (police officer making a traffic stop must have “specific, articulable facts which, taken together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity”) (quoting United States v. Garcia-Camacho, 53 F.3d 244, 246 (9th Cir.1995)); Lopez-Soto, 205 F.3d at 1104 (same). A police officer may rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also “be grounded in objective facts and be capable of rational explanation.” Michael R., 90 F.3d at 346.
Second, the stop must be an ordinary traffic stop. The Supreme Court was careful in Whren to specify that its rationale, and its holding, was limited to what it called the “run-of-the-mine case.” Whren, 517 U.S. at 819, 116 S.Ct. 1769. That is, if a detention of a vehicle by police is other than a “run-of-the-mine” traffic stop, Whren does not apply.
If either of these two requirements is not satisfied, a detention is not a valid traffic stop under Whren. I consider them in sequence.
*724 A. “Specific, Articulable Facts”
A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. United States v. Caymen, 404 F.3d 1196, 1199 (9th Cir.2005). But when a traffic stop based on Whren is at issue, the police officer has the initial burden of production. That is, Officer Boehmer had the burden of providing “specific, articulable facts” to justify a “reasonable suspicion” to believe that Willis had violated the traffic laws. Terry, 392 U.S. at 21, 88 S.Ct. 1868; Michael R, 90 F.3d at 346; Lopez-Soto, 205 F.3d at 1104. In the absence of such “specific, articulable facts” provided by the police officer, the defendant has no obligation to refute the police officer’s testimony, for he has failed to satisfy his initial burden of production. Unless the police officer provides “specific, articulable facts,” a traffic stop under Whren is invalid.
Officer Boehmer failed to carry his initial burden of production of providing “specific, articulable facts” to justify a reasonable suspicion that Willis violated the traffic laws. Even when invited- to do so, Officer Boehmer failed to point to a single provision of Nevada or Las Vegas traffic laws that Willis might have violated. Officer Boehmer admitted forthrightly in his testimony, “I don’t really write too many tickets.” Rather, “I just mostly do criminal investigations.”
Officer Boehmer first asserted that Willis’s “rapid turn” onto Las Vegas Boulevard was a traffic violation, but he was unable, even when asked, to specify any law that had been violated. Officer Boeh-mer next asserted that Willis had broken the speed limit, but Officer Boehmer did not specify the applicable speed limit, and was unable to say, even when asked, exactly how fast Willis was going. It is apparent from Officer Boehmer’s narrative that Willis’s speed would have been limited by the route he took, for Willis never had more than two blocks of straight driving before turning onto another street. Finally, Officer Boehmer asserted that Willis had made an illegal U-turn on Hoover Avenue. But it is apparent from Officer Boehmer’s testimony that the U-turn was accomplished on a stretch of Hoover that was bordered by residential apartments. Officer Boehmer failed to specify any traffic law forbidding a U-turn in a residential area. He also failed to specify that Willis’s U-turn was performed in an unsafe manner, or in any other manner that would have violated the traffic laws.
B. “Traffic Stop”
The totality of circumstances surrounding Officer Boehmer and Miller’s arrest of Willis make it clear that they did not perform a “run-of-the-mine” traffic stop within the meaning of Whren. I recognize that there are circumstances in which a valid traffic stop under Whren can take place after a car has already been stopped. For example, if a police vehicle openly pursues a fleeing car and the driver belatedly decides to pull over and stop to wait for the police vehicle to catch up, no one would dispute that the ear had been subjected to a traffic stop within the meaning of Whren. But this is hardly such a case.
Officer Boehmer made clear in his testimony that he suspected Willis of criminal activity. After Willis made his first stop on Hoover, Officer Boehmer called for backup and drove to a secluded alley where he could watch and wait for his back-up. After Officer Miller arrived, Officer Boehmer told him what was happening. Willis then returned to his car, made a U-turn on Hoover, and drove less than a block to park in front of his own apartment.
After Willis had already parked his car on his own accord, Officers Boehmer and *725 Miller “swooped in,” boxing in the already-stopped car from the front and rear. Officers Boehmer and Miller then behaved exactly as one would expect welltrained officers to behave when stopping someone suspected of criminal activity. To dissuade Willis from running away, Officer Boehmer “immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his jacket pockets[.]” To ensure the officers’ safety, Officer Boehmer asked Willis if he had “anything on [him] I should know about.” When Willis replied that he had a gun, Officer Boehmer arrested him and took him to the detention center.
After stopping Willis, Officer Boehmer never mentioned any traffic violation or issued any traffic citation. Nor did Officer Boehmer ever mention any traffic violation in his two written reports prepared after Willis’s arrest. The first time a purported traffic violation was mentioned was when Officer Boehmer was questioned by government counsel at the suppression hearing.
C. Summary
The majority’s rationale under Whren thus fails on both counts, either one of which is fatal. Officer Boehmer did not provide “specific, articulable facts” that justified reasonable suspicion that Willis had violated any traffic law. Further, Officers Boehmer and Miller’s detention and arrest of Willis was not a “run-of-the-mine” traffic stop within the meaning of Whren.
III. Failure to Remand
Even if I agreed with the majority’s legal analysis, I could not agree with its disposition. Rather than remand for fact-finding, the majority simply affirms the denial of Willis’s suppression motion.
Because the district court concluded — as I do — that Officers Boehmer and Miller did not perform a traffic stop within the meaning of Whren, it did not determine whether Officer Boehmer’s testimony about Willis’s driving was credible. The magistrate judge noted that Willis had contended that Officer Boehmer’s testimony was “simply not credible.” But the magistrate judge wrote that he did not “need [to] assess the credibility of the officer’s testimony about Willis’s driving” because there had been no traffic stop under Whren.
Unlike the district court, the majority concludes that there was a traffic stop under Whren. It also concludes that the traffic stop was justified by a reasonable suspicion that Willis had committed a traffic violation. In order to reach the second conclusion, it treats Officer Boehmer’s testimony about Willis’s driving as credible. It does so despite Willis’s explicit challenge to its credibility, and despite the magistrate judge’s explicit refusal to “assess [its] credibility.” Under the circumstances, I would-remand to the district court for factfinding.
Conclusion
The majority distorts the law to hold that Officers Boehmer and Miller performed a permissible traffic stop under Whren. The majority recognizes the weakness of the other two rationales offered by the government — -a reasonable suspicion of criminal activity under Terry and the community caretaking function under Cady v. Dombrowski. But the majority’s alternative rationale is even worse. If, on these assumed facts, Officer Boehmer provided “specific, articulable facts” to support a reasonable suspicion that Willis had broken the traffic laws, “reasonable suspicion” has lost much of its meaning. And if, on these facts, Officers Boehmer *726 and Miller performed a “run-of-the-mine” “traffic stop,” those terms, too, have lost their meaning.