# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

MARK LAMOND WILLIS,
          *Defendant-Appellant.*

No. 04-10079

D.C. No.
CR-03-00157-
PMP/LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
December 8, 2004—San Francisco, California

Filed December 19, 2005

Before: Alex Kozinski, William A. Fletcher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge W. Fletcher

16549

**COUNSEL**

Anne R. Traum, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

Andrew W. Duncan (argued) and Thomas S. Dougherty, Assistant United States Attorneys, Las Vegas, Nevada, for the plaintiff-appellee.

---

**OPINION**

BYBEE, Circuit Judge:

Appellant Mark Lamond Willis appeals the denial of his motion to suppress evidence following his conditional guilty plea for violation of 18 U.S.C. §§ 922(g) and 924(a)(2), felon in possession of a firearm and forfeiture of the firearm. Willis moved to suppress the firearm found in his possession as the fruit of an illegal seizure. *See* U.S. CONST. amend. IV. Finding his arguments unpersuasive, we affirm the district court's denial of the motion to suppress evidence and affirm Willis's conviction.

I

On December 19, 2002, around 2:00 a.m., Las Vegas Metropolitan Police Department ("LVMPD") Officer Carl Boehmer "observed a [white two-door] vehicle turning rapidly onto Las Vegas Boulevard . . . ." Officer Boehmer testified that the vehicle's rapid turn attracted his attention because "[i]t was just a more excessive turn than a citizen should [make]." He followed the vehicle as it made two more quick turns before stopping in front of an apartment building in a high-crime area. Officer Boehmer then watched a male (later identified as Willis) get out of the car, sprint across the street and up the stairs to the second floor of an apartment building, and pound on the door until he was admitted into one of the apartments. When Officer Boehmer drove past the vehicle, he noticed that Willis had left the windows down, which he thought was unusual because there are "many stolen vehicles in that area . . . [and] gang activity . . . ." He then ran a check on Willis's

Colorado license plate, and notified his dispatch unit to request a backup unit.

The LVMPD Communications Center informed Officer Boehmer that the car was listed as a "suspicious vehicle" and that there was a National Crime Information Center ("NCIC") missing person's report or "hit" associated with the license plate.[1] After receiving this information, Officer Boehmer positioned himself in an alley where he could watch the car and the apartment. Shortly thereafter, Officer D. Miller arrived, and as Officer Boehmer was describing the situation, Willis exited the apartment, reentered his vehicle, made an illegal U-turn, and drove a short distance before pulling over in front of a second apartment complex a block or two away. Officers Boehmer and Miller each made U-turns, turned on their overhead lights, and boxed in Willis's car.

As the officers parked their vehicles, Willis stepped out of his car and looked nervously from side-to-side at the patrol cars. Officer Boehmer testified that he believed that Willis was contemplating running away, and he ordered Willis to step in front of the vehicle and show his hands. Officer Boehmer testified that he "immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his pockets because at the time he had his hands in his jacket pockets. . . . [F]rom my experience again, someone that . . . immediately opens up their vehicle and jumps out and begins looking side to side pretty frantically is, in my experience they've always taken off running. So before . . . he had a chance to, I just started giving commands."

---

[1]The NCIC is "a national criminal records data system administered by the Federal Bureau of Investigation. *See* 28 U.S.C. § 534. NCIC contains criminal history information, including outstanding arrest warrants, and is available to police departments nationwide. State law enforcement agencies are connected to NCIC through their computer systems." *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 923-24 (9th Cir. 2001).

Willis complied, and as Officer Boehmer approached him, Officer Boehmer asked, "Do you have anything on you I should know about?" Willis replied, "Yes, I do." When Officer Boehmer asked "what is it?", Willis answered: "a gun." Officer Miller requested permission from Willis to look inside his pockets, which Willis gave, and the officer retrieved a fully loaded .25 caliber handgun from Willis's jacket.

Officer Boehmer questioned Willis about the firearm while Officer Miller "proceeded to take care of the missing person['s report]." Willis explained to the officers that the person identified in the report was his girlfriend and that she was in his apartment.[2] Officer Miller conducted an interview with Willis's girlfriend upstairs in the apartment complex. Officer Boehmer testified that "she was okay, and she stated that she had talked with her family and it [the NCIC missing person's report] needed to be cleared out of the system."

Willis admitted to the officers that he had been convicted of crimes in Hawaii and Colorado. Officer Boehmer confirmed this through a criminal history check, and he arrested Willis for being an "ex-felon in possession of a firearm, carrying a concealed weapon, [and] ex-felon failure to register."

Willis moved to suppress the evidence of the handgun. He argued that the officers had violated his Fourth Amendment rights by detaining and searching him, and that the evidence

---

[2]LVMPD officers had stopped Willis and his girlfriend a week earlier, on December 12, in response to the NCIC report. During that encounter, police questioned Willis about the missing person's report and determined that Willis's girlfriend was not in any danger. LVMPD requested that the Escondido Police Department ("EPD"), which issued the report, call and confirm that the missing person's report was still current. EPD confirmed the report, and asked LVMPD to send a "locate," which is information stating that the missing person has been located in the area. LVMPD contacted Willis's girlfriend's family and EPD to give them information about her, but the record does not indicate when or if LVMPD sent the requested "locate" to EPD.

of the handgun was the illegal fruit of that detention and search. The magistrate judge concluded in his report and recommendation that the officers had no "reasonable articulable suspicion . . . of criminal activity" to justify an investigatory *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). However, the magistrate judge found that "[u]nder these circumstances . . . Officer Boehmer's community caretaking function required him to take reasonable steps in an effort to determine the current status of the alleged missing person. His failure to do so would have amounted to a dereliction of duty."

The district court adopted the magistrate judge's report and recommendation over Willis's objections. Willis entered a conditional guilty plea, preserving his objection to the denial of his motion to suppress the evidence recovered during the search. The district court sentenced Willis to a term of thirty-three months imprisonment. Willis appeals the denial of his motion to suppress.[3]

## II

Willis argues that neither the community caretaking function nor the related emergency aid doctrine justified his seizure. He also argues that the police officers did not have reasonable suspicion for the stop, and that the government waived its arguments advocating reasonable suspicion when it failed to object to the findings of the magistrate judge's report.[4]

---

[3]We review the district court's denial of Willis's motion to suppress evidence *de novo*; the district court's factual findings are reviewed for clear error. *See United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003).

[4]Willis argues that the government waived its reasonable suspicion argument by failing to present it to the district court when the district court adopted the magistrate judge's report and recommendation denying Willis's motion to suppress. *See In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management)*, 357 F.3d 900, 910 (9th Cir. 2004). Here, the government prevailed before the magistrate judge. A party prevailing before a magistrate judge need not object to the magistrate's report and

We decline to determine whether the community caretaking function, or the emergency aid doctrine, justified the officers' detention of Willis. Instead, we hold that the detention came within the scope of a valid traffic stop, because Officer Boehmer had at least reasonable suspicion—if not probable cause —to stop Willis for violating the traffic laws. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("the usual traffic stop is more analogous to a so-called *'Terry* stop' than to a formal arrest"; holding that a traffic stop requires reasonable suspicion (internal citation omitted)); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) ("the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops"; holding that "the Court in *Whren* [did not] intend[ ] to change this settled rule"). Since Willis's detention was supported by reasonable suspicion, the officers could reasonably question Willis to ensure their own safety. Once Willis admitted pos-

recommendation in order to preserve its right to argue an alternative theory in support of the recommendation on appeal. *See Britt v. Simi Valley Unified Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983) ("The language of [28 U.S.C. § 636(b)(1)] does not indicate that failure to object to a magistrate's recommendation will be an absolute bar to appeal from the district court's decision."), *overruled on other grounds*, *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir. 2003) (en banc). *But cf. McCall v. Andrus*, 628 F.2d 1185, 1187 (9th Cir. 1980) (holding that waiver is appropriate where a party's failure to object to the magistrate judge's conclusions of law was coupled with its failure to raise the objection until its reply brief); *Schmidt v. Johnstone*, 263 F. Supp. 2d 1219, 1222-24 (D. Ariz. 2003) (noting a possible intra-circuit conflict on whether a failure to object to a magistrate's conclusions of law waives the right to appeal them). Although *Britt* and *McCall* are to some degree in tension, *Britt*'s core holding—that a prevailing party need not object to a magistrate judge's conclusions of law in order to preserve those grounds for appeal— remains good law, at least where the objections are raised on appeal in either the prevailing party's opening or answer brief. *See* 28 U.S.C. § 636(b)(1).

sessing the weapon, the officers' search to relieve Willis of his weapon was also reasonable.

A

**[1]** "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Such investigatory stops are justified by "reasonable suspicion" that criminal activity may be afoot. *Arvizu*, 534 U.S. at 273; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Cortez*, 449 U.S. at 417. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions . . . but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California*, 384 U.S. 757, 768 (1966). The "touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted).

**[2]** Although we look to reasonableness in determining the propriety of a stop under the Fourth Amendment, the Supreme Court's decision in *Whren v. United States* does not require us to determine the reasonableness of a temporary detention if there is reasonable suspicion to conclude that a traffic violation occurred. *Whren*, 517 U.S. at 818-19. In *Whren*, a unanimous Supreme Court held that a stop was reasonable under the Fourth Amendment where officers had probable cause to believe that the petitioner violated the traffic code, even if the ultimate charge was not related to the traffic stop. *Id.* at 808-09. Police observed a truck in a "high drug area" stopped at stop sign for an excessive amount of time, which then turned without signaling and sped off at an excessive speed. *Id.* at 808. Once the police caught up to the vehicle, the officers

observed Michael Whren, one of the passengers, holding two large bags of what appeared to be crack cocaine. Whren argued that the stop had not been justified by probable cause to believe that the occupants were engaged in illegal drug activity, and that the officers' asserted ground for approaching the vehicle, which was to give them a warning about traffic violations, was pretextual. *Id.* at 809.

The Supreme Court held that the officers had probable cause to believe that various provisions of the traffic code had been violated. *Id.* at 810. The Court specifically declined to hold that the Fourth Amendment test for traffic stops should be "whether a police officer, acting reasonably, would have made the stop for the reason given." *Id.* Rather, the Court explained that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and that "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id.* at 813. *Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose. *See also Devenpeck v. Alford*, 125 S. Ct. 588, 593-94 (2004) ("[The] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

**[3]** There is ample evidence that the officers had at least reasonable suspicion to stop Willis for his traffic violations. First, Officer Boehmer testified that he watched Willis make an illegal U-turn on Hoover. Second, Officer Boehmer testified that he watched Willis make a rapid turn, stating, "It was a traffic violation being that it was a turn — making a turn more excessive than it should have been [and] . . . it would have been a municipal traffic code [violation]." Third, according to testimony by Officer Boehmer, Willis's car also appeared to accelerate excessively. *Cf. Whren*, 517 U.S. at 808 (police stopped car after it "turned suddenly to its right, without signaling, and sped off at an 'unreasonable' speed.")

Officer Boehmer specifically noted that after he observed the rapid turn, "I was going to follow him to see if he had made any *other — other traffic violations . . . .*" (emphasis added). It is clear from Officer Boehmer's testimony that he observed several traffic violations, including driving too fast, rapid turns, and an illegal U-turn.[5]

The fact that Willis had parked his car at the point that the officers detained him does not affect our analysis. Officer Boehmer did not stop Willis immediately after he first noted Willis's traffic violations, but followed the car to "see if [Willis] made any other traffic violations." Moreover, any delay between Willis's traffic violations and the officers' actions was insignificant. The officers detained Willis as soon as they observed him pull over.

[4] Under *Whren*, we cannot second-guess the reasons for the officer's stop. *Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").[6] Indeed, the Supreme Court recently

---

[5]The dissent purports to take Officer Boehmer at his word, *see* Dissent at 16564, but then proceeds to doubt his observation that Willis committed traffic infractions. *See id.* at 16569-70, 16575-77. The dissent's doubts are based on the fact that the officer did not provide information such as the posted speed limit, the exact speed Willis was traveling or whether the incident occurred in a business district. But the officer has satisfied the government's burden of production by coming forward with "specific and articulable facts," *Terry*, 392 U.S. at 21, to support his suspicion of illegal activity. The defendant has the burden of proof on a motion to suppress evidence, *see United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005), and if Willis wanted to cast doubt on Officer Boehmer's statement that his erratic behavior constituted a traffic infraction, he was required to introduce contrary evidence or get the officer to retract his testimony on cross-examination. Defendant did neither, so Officer Boehmer's testimony that he observed Willis committing traffic infractions stands unrefuted.

[6]The dissent relies on the fact that the magistrate judge "found that the officers did not have a reasonable suspicion of criminal activity that would justify a [*Terry*] stop." Dissent at 16563. The magistrate judge found, in pertinent part, as follows:

affirmed this proposition in *Devenpeck*: "Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." 125 S. Ct. at 593-94. Therefore, as long as "the officers had probable cause to believe that [Willis] had violated the traffic code[,] . . . the stop [was] reasonable under the Fourth Amendment." *Whren*, 517 U.S. at 819. The officer testified that he was planning on conducting a vehicle stop "because of the information of the NCIC missing person . . . [*and*] because of the way the vehicle was evading me and conducting an illegal U-turn also, in the middle of Hoover." Since Officer Boehmer could have relied on the traffic viola-

---

> Here, the court finds that the totality of the circumstances described by Officer Boehmer did not give rise to a "reasonable articulable suspicion" that Willis was engaged in or about to engage in some identifiable form of criminal activity. Although Boehmer may have seen Willis exceeding the speed limit, the reason Boehmer wanted to stop him was not to issue a traffic citation; it was to inquire into the circumstances giving rise to the NCIC missing person hit.

To the extent the magistrate judge made the same mistake as the dissent, by finding reasonable suspicion for a traffic stop lacking based on the officer's subjective motivations, we reverse. The parsing of police motives — as opposed to "articulable facts," *Terry*, 392 U.S. at 21 — is precisely what *Whren* tells us we may not do. *See Whren*, 517 U.S. at 811 (refusing to "endors[e] the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred").

Nor need we remand to establish the basis for a *Terry* stop. *See* Dissent at 16577-78. The magistrate judge made a factual finding after an evidentiary hearing that Willis "made a U-turn on Hoover." Officer Boehmer testified that this turn was illegal, and his testimony is unrefuted. The magistrate judge's statement that "[t]he court need not assess the credibility of the officer's testimony about Willis's driving" presumably refers only to Officer Boehmer's testimony that Willis was traveling at an excessive rate of speed, since the excessive speed allegation — unlike the fact that Willis "made a U-turn on Hoover" — was not part of the magistrate judge's factual findings. Because the illegal U-turn was sufficient to justify the traffic stop, no remand is required.

tion as a justification for stopping Willis, the stop was valid under *Whren*.[7]

The dissent argues that Willis's detention was not a traffic stop because "Officer Boehmer never mentioned any traffic violation or issued any traffic citation." Dissent at 16576. But Officer Boehmer explained that by the manner in which Willis exited his car, Boehmer thought Willis was about to run. It was in the ensuing quick exchanges between Boehmer and Willis that Boehmer discovered that Willis was armed and arrested him. We think it was reasonable for the officers to view any traffic violations as inconsequential in light of Willis's arrest. *Whren* and *Lopez-Soto* require that the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations.[8]

## B

**[5]** Once the police stopped Willis, they could, within reason, search the area and question Willis about weapons for their own safety. "Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995) (citing *United States v.*

---

[7]Willis also argues that the evidence seized in the stop should be excluded because the police had stopped Willis the week before based on the same NCIC report. We find no basis for excluding the evidence. There is nothing in the record that shows Officers Boehmer and Miller were aware that the NCIC missing person's report was outdated, nor is there evidence that the LVMPD deliberately failed to send a "locate" to the Escondido Police Department. In any event, because the officers had at least reasonable suspicion to stop Willis for a traffic violation, the validity of any other reasons they may have had to stop him becomes irrelevant.

[8]Indeed, in *Whren*, the plainclothes vice officer who stopped Whren after observing apparent traffic violations testified that "he did not intend to issue a ticket to the driver for stopping too long at the stop sign, but he wished to stop the Pathfinder to inquire why it was obstructing traffic and why it sped off without signalling in a school area." *United States v. Whren*, 53 F.3d 371, 373 (D.C. Cir. 1995), *aff'd*, 517 U.S. 806 (1996).

*Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir. 1983)). Our cases have justified the use of force in making a stop if it occurs under circumstances justifying fear for an officer's personal safety. *See Jacobs*, 715 F.2d at 1345-46; *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979). In this case, Officer Boehmer merely asked Willis if he had anything that Officer Boehmer should know about. He did not take more extreme measures, but simply asked Willis a question to ensure the officers' personal safety. Officer Boehmer did not act unreasonably in ensuring his personal safety and the safety of his fellow officer. Indeed, even before Officer Boehmer was notified about the NCIC hit, he requested backup for his own safety. As he testified, "I notified dispatch on the radio that I was requesting a backup unit. . . . For officer safety. Due to the suspicious situation, the known gang, prostitution and drug activity in the area . . . for officer safety, I wanted another officer there, and the time of night."

**[6]** Given everything that the officers knew, including the NCIC hit, Willis's erratic driving, the high-crime area, and Willis's nervous and agitated state, Officer Boehmer's question to Willis eliciting information about Willis's gun was reasonable. Once Willis informed the officers that he was carrying a firearm, the officers were entitled to seize the firearm in order to avoid any possibility that Willis would use it against them. The evidence of possession of a firearm was not the fruit of an illegal search, and the evidence need not have been suppressed.

### III

The district court's denial of the motion to suppress the evidence is affirmed. Willis's conviction is affirmed.

AFFIRMED.

W. FLETCHER, Circuit Judge, dissenting:

In his Report and Recommendation, the magistrate judge found that because defendant Mark Willis had already voluntarily stopped his car, Officers Carl Boehmer and D. Miller did not perform a traffic stop under *Whren v. United States*, 517 U.S. 806 (1996). Because the magistrate judge found that there had been no traffic stop, he specifically declined "to assess the credibility of the officer's testimony about Willis's driving." The magistrate judge further found that the officers did not have a reasonable suspicion of criminal activity that would justify a stop under *Terry v. Ohio*, 392 U.S. 1 (1968). However, the magistrate judge found that the stop was justified by the community caretaking function under *Cady v. Dombrowski*, 413 U.S. 433 (1973). In denying Willis's motion to suppress, the district court adopted without change the Report and Recommendation.

The majority declines to affirm the district court's decision based on either *Terry* or *Cady*. Instead, it affirms on a ground explicitly rejected by the magistrate judge and the district court — that Officers Boehmer and Miller performed a permissible traffic stop under *Whren*. For two independent reasons, I respectfully dissent.

First, Officer Boehmer was required to present "specific, articulable facts" to support his contention that there was reasonable suspicion that Willis had violated the traffic laws, and thereby to justify a traffic stop under *Whren*. *Terry*, 392 U.S. at 21; *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996). Despite ample opportunity, he did not do so. Second, *Whren* applies only to "run-of-the-mine" traffic stops. 517 U.S. at 819. The stop at issue in this case was anything but "run-of-the-mine," and therefore does not qualify as a traffic stop under *Whren*.

I.   Facts

Only two people testified at the suppression hearing before the magistrate judge, Officer Boehmer of the Las Vegas Met-

ropolitan Police Department, and defendant Willis. The magistrate judge wrote that he "need not assess the credibility of the officer's testimony about Willis's driving" because he found that no traffic stop occurred, given that "Willis voluntarily pulled his car over in front of his own residence *before* Officers Boehmer and Miller swooped in and surrounded him." (Emphasis in original.) For purposes of my dissent, I assume that Officer Boehmer testified truthfully about what he saw and thought he saw.

As will be apparent, there are two problems with Officer Boehmer's testimony. First, as to his justification for the traffic stop, the problem is not with what Officer Boehmer stated. Rather, the problem is what he *did not* state. That is, Officer Boehmer's testimony does not contain sufficient "specific, articulable facts" to justify a traffic stop. *See Terry*, 392 U.S. at 21, *Michael R.*, 90 F.3d at 346. Second, as to the nature of the stop, Officer Boehmer's testimony makes clear that his detention of Willis was anything but a "run-of-the-mine" traffic stop. Because it was not such a traffic stop, it cannot be justified under *Whren*.

## A.   Willis's Driving

Early in the morning of December 19, 2002, Willis, an African-American male, was driving a car with Colorado license plates within the city limits of Las Vegas, Nevada. Officer Boehmer testified that he began to follow Willis in a marked patrol car after seeing him make a "rapid turn" from Hoover Avenue right onto Las Vegas Boulevard. Officer Boehmer testified at the hearing that three aspects of Willis's driving warranted a stop for traffic violations — his "rapid turn" onto Las Vegas Boulevard, his accelerating and speeding after that turn, and his later U-turn on Hoover Avenue. I consider them in sequence.

### 1.   "Rapid Turn"

Officer Boehmer testified that the "rapid turn" onto Las Vegas Boulevard from Hoover Avenue was "more excessive

than it should have been," and that he believed this turn violated the traffic laws. Officer Boehmer elaborated in an exchange with the magistrate judge:

Q:   What do you mean that the turn is more excessive than it should have been?

A:   Well, the speed is more excessive than I'd say operating speed would be.

Q:   All right. What is the traffic code violation?

A:   I don't know, Your Honor.

Q:   No citation was issued in this case?

A:   No.

Q:   Do you have any idea what — I mean, is there — this was in the city of Las Vegas and would have been under the — either the state's —

A:   It would have been — it would have been a municipal traffic code. Yes, Your Honor.

Q:   Okay. And you don't know what the traffic code would be?

A:   No, Your Honor. I don't really write too many tickets.

Q:   Okay.

A:   I just mostly do criminal investigations.

2.   Accelerating and Exceeding the Speed Limit

Officer Boehmer testified that after turning right onto Las Vegas Boulevard, Willis turned right onto Charleston Boule-

vard, turned right onto Third Street, and finally turned right back onto Hoover Avenue. The distance on Las Vegas Boulevard between Hoover Avenue and Charleston (*i.e.*, between Willis's first and second turns) is one block. The distance on Charleston between Las Vegas Boulevard and Third Street (*i.e.*, between his second and third turns) is two blocks. The distance on Third Street between Charleston and Hoover (*i.e.*, between his third and fourth turns) is a block and a half. After his fourth right turn back onto Hoover, Willis parked his car on the south side of the street at or near the northwest corner of Third and Hoover. Willis traveled essentially in a circle, covering a total distance of somewhere between four-and-a-half and five blocks.

On direct, Officer Boehmer testified that he was driving northbound on Fourth Street at the intersection of Fourth and Hoover when he first saw Willis. Officer Boehmer was one block away from Willis, who at that moment was making his "rapid" right turn from Hoover onto Las Vegas Boulevard. Officer Boehmer testified that he turned right onto Hoover toward Las Vegas Boulevard to follow Willis. Then, as Officer Boehmer turned right onto Las Vegas Boulevard from Hoover, he saw Willis — still one block ahead of him — turning right onto Charleston. Officer Boehmer testified, "I accelerated to attempt to catch up with the vehicle because it was apparent to me, with the distance he had gained, he had been accelerating. I then made a westbound turn onto Charleston, and at the time the vehicle was just beginning to make a turn onto northbound Third Street." Boehmer testified that in his opinion Willis was trying to evade him. He said, "Just from my experience — my three years experience, in the past people trying to evade me, make rapid continuous turns like that."

On further questioning by the magistrate judge, Officer Boehmer reiterated his view that Willis's right turn onto Las Vegas Boulevard had been a traffic violation. He also stated

for the first time that, although he could not tell "exactly how fast" Willis was traveling, he was exceeding the speed limit:

Q: [A]s you reached Hoover, to your right you looked and saw this white vehicle making a right turn from Hoover onto Las Vegas Boulevard south-bound?

A: Yes. Yes, Your Honor.

Q: A rapid turn?

A: Yes, a rapid turn.

Q: Was it a traffic violation in your judgment?

A: It is. Basically the way he made his turn.

Q: Is that what you thought at the time?

A: Oh, definitely at the time, that's why I continued to follow him. And then once I made the turn and I observed how far he had gotten from me, the distance that he had gained, he wasn't going the speed limit. I had, you know, no way to tell exactly how fast, but he wasn't going the speed limit because I had to accelerate excessively to try to catch up with him.

The magistrate judge sought to clarify the distances (and, by inference, the speeds) involved, asking if Officer Boehmer could see Willis after he turned onto Charleston from Las Vegas Boulevard, and then again after he turned onto Third from Charleston:

Q: So you saw him make a right turn on Third [from Charleston]?

A:   Yes I did.

Q:   And then when you reached Third and made a right turn, do you recall where he was when you were able to see down Third Street?

A:   Yes. I believe he was already past Coolidge because I was saying — I remember saying to myself, man, this guy is driving so fa[s]t, you know it was almost to the point I was going to call out the vehicle pursuit, but I had no other description besides the white vehicle.

The distance between Charleston and Third is a block and a half. Coolidge comes into Third at an angle, joining Third half a block up from Charleston. The magistrate judge continued:

Q:   And then when you turned north on Third Street, he was already halfway between Coolidge and Hoover?

A:   Yes.

Q:   He must have been slowing down as he approached Hoover, correct?

A:   He did.

Q:   And he then made a right turn on Hoover?

A:   Yes.

Q:   Just around the corner practically —

A:   Yes.

Q:   — and parked —

A:   Yes.

Q:   On the south side of the street?

A:   Yes, Your Honor.

When Willis parked his car, he was less than two blocks from where he had been when Officer Boehmer had first spotted him. He was now back on Hoover, pointed in the same direction he had been driving when he made his "rapid turn" from Hoover onto Las Vegas Boulevard.

Officer Boehmer never testified as to the speed limit on the streets on which Willis traveled, or as to the exact speed Willis was traveling. He also made no attempt to explain how Willis had been able to exceed the speed limit when he never traveled more than two blocks in a straight line. Nor did Officer Boehmer attempt to reconcile his belief that Willis was trying to evade him with the fact that Willis had essentially driven in a four-and-a-half to five-block circle, coming back onto Hoover and then stopping voluntarily.

### 3.   U-Turn on Hoover

After parking his car on Hoover, Willis got out, "sprinted" (Officer Boehmer's word) across the street to a nearby apartment, and banged on the door. He was admitted to the apartment and stayed for a short time. He then came out of the apartment, got into his car, and made a U-turn on Hoover. He crossed Third Street and stopped the car at the curb on Hoover in front of what we now know was his own apartment.

Officer Boehmer testified that Willis's U-turn on Hoover was illegal, but he cited no provision of any applicable traffic law. Nevada's traffic laws provide that "[a] U-turn may be made on any road where the turn can be made with safety, except as prohibited by this section and by the provisions of N.R.S. 484.309 [driving on a divided highway] and 484.339

[turning on a curve or crest/grade].” Nev. Rev. Stat. 484.337(1) (2002). U-turns may not be performed at stoplights that have signs prohibiting these turns. *Id.* at 484.337(2). Nor may they be performed in a business district unless at an intersection. *Id.* at 484.337(3). Las Vegas’s municipal traffic code provides, “The driver of any vehicle shall not turn such vehicle so as to proceed in the opposite direction upon any street in a business district and shall not upon any other street so turn a vehicle unless such movement can be made in safety and without interfering with other traffic.” Las Vegas Mun. Code 11.12.050 (2005).

Nowhere in his testimony did Officer Boehmer state that Hoover Avenue at Third Street is in a business district. We know from Officer Boehmer’s testimony that there were residential apartments along Hoover at the point where Willis made his U-turn. Further, Officer Boehmer’s testimony indicates that there was no traffic on Hoover when Willis performed the U-turn. Finally, there is nothing in Officer Boehmer’s testimony to indicate that there was a stoplight or a sign prohibiting a U-turn, or that Willis’s U-turn was unsafe.

### 4.   Other Evidence

Officer Boehmer testified at the suppression hearing that he had no recollection of having mentioned any traffic violations to Willis during the course of the arrest, and that no traffic citation was ever issued to Willis. Officer Boehmer further testified that he did not mention Willis’s rapid accelerating and speeding in either of his two written reports prepared after the arrest. Officer Boehmer did mention Willis’s U-turn in his reports, but only as part of the narrative leading up to Willis’s voluntary stop in front of his own apartment. Officer Boehmer did not indicate anywhere in his two written reports that Willis’s U-turn was illegal. Indeed, there is nothing in either of Officer Boehmer’s two reports to indicate that Willis had violated the traffic laws in any manner, or that Officer Boehmer had stopped Willis for a traffic violation.

### B.    Circumstances of the "Traffic Stop"

Officer Boehmer's testimony makes clear that he suspected that Willis was engaged in, or had engaged in, criminal activity. He testified that his suspicions were first aroused by Willis's manner of driving between the time of his initial turn from, and subsequent return to, Hoover Avenue. His suspicions were further aroused when Willis parked on Hoover, left his windows rolled down, ran across the street, and banged on the door of an apartment. At that point, Officer Boehmer asked that a check be run on the Colorado license plates of Willis's car. He also asked for back-up: "Due to the suspicious situation, the known gang, prostitution and drug activity in the area, I just, for officer safety, I wanted another officer there, and the time of night." While he waited for his back-up to arrive, Officer Boehmer made a U-turn on Hoover and drove a little over half a block away to the west. He parked in an alley that intersected Hoover between Third Street and Casino Center Boulevard. He testified that he had an unobstructed view from the alley to the apartment complex to which Willis had run.

Officer Boehmer testified that the license plate check revealed that Willis's car was listed as a "suspicious vehicle in an earlier event almost a week earlier." It also revealed "that the vehicle has a missing persons [National Crime and Information Center ("NCIC")] hit on it." About a week earlier, the woman who owned the car Willis was driving had been driving with Willis in Las Vegas. They were stopped by Las Vegas police because the car had a missing person listing on the NCIC system. During the stop, Las Vegas police officers learned that the woman was in Las Vegas on her own volition and wanted no assistance. According to Officer Boehmer, the suspicious vehicle report had been entered into the local Las Vegas police department system at about the time of this stop.

Las Vegas police contacted the woman's family and the Escondido, California Police Department (the source of the

missing person listing) to tell them what they had learned. The Escondido Police Department requested that the Las Vegas Police Department let them know where the woman was so that she could be removed from the missing persons list. The record does not indicate when or if the Las Vegas Police Department responded to this request. However, none of this was known to Officer Boehmer as he watched from the alley. The only thing he knew was that the car was listed as a "suspicious vehicle" on the local Las Vegas system, and there was an NCIC missing persons "hit" on the car.

Officer Miller arrived in a separate police car in response to the back-up request. While Officer Boehmer was describing the situation to Officer Miller, Willis came back out of the apartment. Willis got into his car, made a U-turn on Hoover, and drove less than a block. Still on Hoover, Willis pulled over to the curb of his own accord and parked in front of his own apartment. Officers Boehmer and Miller immediately moved to box in Willis's car. Officer Boehmer made a U-turn, turned on his overhead lights, and drove up behind Willis's car. Officer Miller made a U-turn from the other direction, turned on his overhead lights, and drove up to the front of Willis's car.

Officer Boehmer testified that Willis opened his car door as he was in the middle of his U-turn. Then, "as he stepped out [of his car] I was putting my vehicle into park and I observed a black male start looking from side to side rapidly." Boehmer testified, "I immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his pockets because at the time he had his hands in his jacket pockets. . . . [F]rom my experience again, someone that, you know, immediately opens up their vehicle and jumps out and begins looking from side to side frantically is, in my experience they've always taken off running. So before, you know, he had a chance to, I just started giving commands."

Officer Boehmer testified that Willis complied with his commands. After Willis had walked to the front of the police

car, Officer Boehmer asked him, "[D]o you have anything on you I should know about?" According to Officer Boehmer, Willis "said he had a gun." Officer Boehmer says he "then asked him to place his hands behind his back and spread his feet apart[.]" Officer Boehmer testified that Officer Miller "gained [Willis's] consent" to look in his pockets, where he found a loaded firearm. Officer Boehmer testified that he then gave Willis a *Miranda* warning and asked him more questions. He testified that he asked a records clerk to run a criminal history check, and that the check revealed that Willis was a convicted felon. Officer Boehmer placed Willis under arrest "[f]or ex-felon in possession of a firearm, carrying a concealed weapon, ex-felon failure to register at that time." After arresting Willis, Officer Boehmer transported him to the Clark County Detention Center.

## II.   Discussion

In *Whren v. United States*, the Supreme Court held that the police may make an ordinary "traffic stop" whenever they have sufficient reason to believe that a traffic law has been violated. It does not matter under *Whren* that the police might have some ulterior motive for making the stop, so long as they have sufficient reason based on suspicion that the traffic laws have been violated. The Court in *Whren* spoke of "probable cause," 517 U.S. at 819, but we, along with other circuits, have construed *Whren* to require only that the police have "reasonable suspicion" to believe that a traffic law has been broken. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000).

*Whren* gives the police considerable leeway in making traffic stops, but it does not provide them carte blanche. There are two independent requirements for a valid traffic stop under *Whren*.

First, "specific, articulable facts" to justify reasonable suspicion must be provided by the police officer. As stated by the

Supreme Court in *Terry*, "the police officer must be able to point to *specific, articulable facts* which, together with rational interferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21 (emphasis added). *See also United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (police officer making a traffic stop must have "specific, articulable facts which, taken together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity" (quoting *United States v. Garcia-Comacho*, 53 F.3d 244, 246 (9th Cir. 1995)); *Lopez-Soto*, 205 F.3d at 1104 (same). A police officer may rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also "be grounded in objective facts and be capable of rational explanation." *Michael R.*, 90 F.3d at 346.

Second, the stop must be an ordinary traffic stop. The Supreme Court was careful in *Whren* to specify that its rationale, and its holding, was limited to what it called the "run-of-the-mine case." *Whren*, 517 U.S. at 819. That is, if a detention of a vehicle by police is other than a "run-of-the-mine" traffic stop, *Whren* does not apply

If either of these two requirements is not satisfied, a detention is not a valid traffic stop under *Whren*. I consider them in sequence.

### A.    "Specific, Articulable Facts"

A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Cayman*, 404 F.3d 1196, 1999 (9th Cir. 2005). But when a traffic stop based on *Whren* is at issue, the police officer has the initial burden of production. That is, Officer Boehmer had the burden of providing "specific, articulable facts" to justify a "reasonable suspicion" to believe that Willis had violated the traffic laws. *Terry*, 392 U.S. at 21; *Michael R.*, 90 F.3d at 346; *Lopez-Soto*, 205 F.3d at 1104. In the absence of such "spe-

cific, articulable facts" provided by the police officer, the defendant has no obligation to refute the police officer's testimony, for he has failed to satisfy his initial burden of production. Unless the police officer provides "specific, articulable facts," a traffic stop under *Whren* is invalid.

Officer Boehmer failed to carry his initial burden of production of providing "specific, articulable facts" to justify a reasonable suspicion that Willis violated the traffic laws. Even when invited to do so, Officer Boehmer failed to point to a single provision of Nevada or Las Vegas traffic laws that Willis might have violated. Officer Boehmer admitted forthrightly in his testimony, "I don't really write too many tickets." Rather, "I just mostly do criminal investigations."

Officer Boehmer first asserted that Willis's "rapid turn" onto Las Vegas Boulevard was a traffic violation, but he was unable, even when asked, to specify any law that had been violated. Officer Boehmer next asserted that Willis had broken the speed limit, but Officer Boehmer did not specify the applicable speed limit, and was unable to say, even when asked, exactly how fast Willis was going. It is apparent from Officer Boehmer's narrative that Willis's speed would have been limited by the route he took, for Willis never had more than two blocks of straight driving before turning onto another street. Finally, Officer Boehmer asserted that Willis had made an illegal U-turn on Hoover Avenue. But it is apparent from Officer Boehmer's testimony that the U-turn was accomplished on a stretch of Hoover that was bordered by residential apartments. Officer Boehmer failed to specify any traffic law forbidding a U-turn in a residential area. He also failed to specify that Willis's U-turn was performed in an unsafe manner, or in any other manner that would have violated the traffic laws.

## B. "Traffic Stop"

The totality of circumstances surrounding Officer Boehmer and Miller's arrest of Willis make it clear that they did not

perform a "run-of-the-mine" traffic stop within the meaning of *Whren*. I recognize that there are circumstances in which a valid traffic stop under *Whren* can take place after a car has already been stopped. For example, if a police vehicle openly pursues a fleeing car and the driver belatedly decides to pull over and stop to wait for the police vehicle to catch up, no one would dispute that the car had been subjected to a traffic stop within the meaning of *Whren*. But this is hardly such a case.

Officer Boehmer made clear in his testimony that he suspected Willis of criminal activity. After Willis made his first stop on Hoover, Officer Boehmer called for backup and drove to a secluded alley where he could watch and wait for his back-up. After Officer Miller arrived, Officer Boehmer told him what was happening. Willis then returned to his car, made a U-turn on Hoover, and drove less than a block to park in front of his own apartment.

After Willis had already parked his car on his own accord, Officers Boehmer and Miller "swooped in," boxing in the already stopped car from the front and rear. Officers Boehmer and Miller then behaved exactly as one would expect well-trained officers to behave when stopping someone suspected of criminal activity. To dissuade Willis from running away, Officer Boehmer "immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his jacket pockets[.]" To ensure the officers' safety, Officer Boehmer asked Willis if he had "anything on [him] I should know about." When Willis replied that he had a gun, Officer Boehmer arrested him and took him to the detention center.

After stopping Willis, Officer Boehmer never mentioned any traffic violation or issued any traffic citation. Nor did Officer Boehmer ever mention any traffic violation in his two written reports prepared after Willis's arrest. The first time a purported traffic violation was mentioned was when Officer

Boehmer was questioned by government counsel at the suppression hearing.

## C. Summary

The majority's rationale under *Whren* thus fails on both counts, either one of which is fatal. Officer Boehmer did not provide "specific, articulable facts" that justified reasonable suspicion that Willis had violated any traffic law. Further, Officers Boehmer and Miller's detention and arrest of Willis was not a "run-of-the-mine" traffic stop within the meaning of *Whren*.

## III. Failure to Remand

Even if I agreed with the majority's legal analysis, I could not agree with its disposition. Rather than remand for fact-finding, the majority simply affirms the denial of Willis's suppression motion.

Because the district court concluded — as I do — that Officers Boehmer and Miller did not perform a traffic stop within the meaning of *Whren*, it did not determine whether Officer Boehmer's testimony about Willis's driving was credible. The magistrate judge noted that Willis had contended that Officer Boehmer's testimony was "simply not credible." But the magistrate judge wrote that he did not "need [to] assess the credibility of the officer's testimony about Willis's driving" because there had been no traffic stop under *Whren*.

Unlike the district court, the majority concludes that there was a traffic stop under *Whren*. It also concludes that the traffic stop was justified by a reasonable suspicion that Willis had committed a traffic violation. In order to reach the second conclusion, it treats Officer Boehmer's testimony about Willis's driving as credible. It does so despite Willis's explicit challenge to its credibility, and despite the magistrate judge's

explicit refusal to "assess [its] credibility." Under the circumstances, I would remand to the district court for factfinding.

## Conclusion

The majority distorts the law to hold that Officers Boehmer and Miller performed a permissible traffic stop under *Whren*. The majority recognizes the weakness of the other two rationales offered by the government — a reasonable suspicion of criminal activity under *Terry* and the community caretaking function under *Cady v. Dombrowski*. But the majority's alternative rationale is even worse. If, on these assumed facts, Officer Boehmer provided "specific, articulable facts" to support a reasonable suspicion that Willis had broken the traffic laws, "reasonable suspicion" has lost much of its meaning. And if, on these facts, Officers Boehmer and Miller performed a "run-of-the-mine" "traffic stop," those terms, too, have lost their meaning.