
# IN THE SUPREME COURT OF GUAM

## IN THE INTEREST OF D.S., S.S, R.H., J.S., and S.S.,
Minors.

Supreme Court Case No.: CVA22-005
Superior Court Case No.: JP0076-18

## OPINION

## Cite as: 2023 Guam 13

Appeal from the Superior Court of Guam
Argued and submitted on March 2, 2023
Hagåtña, Guam

Appearing for Respondent-Appellant A.H.:
F. Randall Cunliffe, *Esq.*
Cunliffe & Cook
A Professional Corporation
210 Archbishop Flores St., Ste. 200
Hagåtña, GU 96910

Appearing for Petitioner-Appellee
Government of Guam:
Jordan Lawrence Pauluhn, *Esq.*
Office of the Attorney General
Litigation Division
590 S. Marine Corps Dr., Ste. 802
Tamuning, GU 96913


E-Received
11/29/2023 1:41:51 PM

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]     Respondent-Appellant A.H. appeals the Family Court's decision to terminate his parental rights and to permanently place his children with couples to whom he is unrelated.  He maintains that his due process rights were violated.  He asks this court to reverse the decision and remand the matter to the Family Court with instructions to either place the minors with family members or in guardianship proceedings that will not terminate his parental rights.[1]

[2]     Petitioner-Appellee Government of Guam ("Government") asserts A.H was afforded his basic due process rights, he waived his right to participate in the proceedings, and his parental rights were properly terminated.  The Government also claims that, because A.H. does not challenge any of the Family Court's findings, he lacks a basis to challenge the placement decision.  Finally, it argues that by failing to object to the referee's judgment, A.H. waived his right of appeal.

[3]     The Child Protective Act provides constitutionally adequate safeguards in a proceeding to terminate parental rights.  The Child Protective Act was followed in this case, and A.H.'s rights were not violated.  The judgment of the Family Court is affirmed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[4]     A.H. was the partner of J.S. ("Mother").  Mother is the natural mother of five minors: D.S., S.S. (Older), R.H., J.S., and S.S. (Younger).  A.H. is the biological father of R.H., J.S., and S.S. (Younger).  In 2018, Child Protective Services ("CPS") received a referral alleging physical neglect and abuse of minors D.S., S.S. (Older), and R.H.  The referral also alleged sexual abuse of

---

[1] This proceeding was brought on behalf of five children, but the record shows that only the youngest three are A.H.'s biological children.  *See* RA, tab 132 at 4 (Proposed Finds. Fact & Concl. L., Aug. 31, 2021).  We therefore limit our analysis to R.H., J.S., and S.S. (Younger) with regards to the termination of A.H.'s parental rights and the children's permanent placement.

S.S. (Older) by A.H. The family was escorted by Guam Police Department ("GPD") officers to the GPD Dededo Precinct to file a report. GPD arrested A.H., at which point he was charged with, among other things, First Degree Criminal Sexual Conduct and committed to the Department of Corrections. S.S. (Older) was transported to Guam Memorial Hospital for a medical examination. Examiners suspected that the four-year-old child had been sexually assaulted. She was transported to Healing Hearts Crisis Center for further examination, at which point it was determined that she had been sexually assaulted and consequently required surgery. That same evening, CPS located a fourth child, J.S., at a homeless shelter, where Mother had placed him with a friend.

[5]      The Family Court granted a verbal *ex parte* order authorizing CPS to exert temporary legal custody over all four children. CPS had discovered that the children had been living in an abandoned house, shared with other homeless individuals and without electricity, running water, doors, or windows. A CPS criminal background check also revealed that both parents had criminal histories. A.H. had multiple prior criminal matters, including for a separate incident of criminal sexual conduct committed against a sixteen-year-old victim, family violence, assault, and charges related to a drunk driving incident. The background check also revealed two police reports filed against Mother, both containing allegations of child abuse. The latter report also contained allegations she had been protecting A.H. from arrest in a criminal sexual conduct matter in which the victim was a minor.

[6]      The children were placed in various foster homes, and CPS filed a Petition for Persons in Need of Services ("PINS"). An answering hearing on the petition was continued because the parents required a Chuukese interpreter. At the continued hearing, the court accepted an admission from Mother that the children were persons needing service. A.H. asked the court to allow him to delay his answer to the petition and to excuse him from any proceedings until his criminal charges

were resolved. CPS was instructed to prepare a service plan agreement for Mother, which she eventually signed.

[7]     In June 2018, Mother gave birth to a fifth child, S.S. (Younger). A.H. is also this child's biological father. CPS exerted temporary legal custody over S.S. (Younger), and three days later placed her in a foster home. She has remained with that family ever since. By July 2019, the other four children had been placed together in a different foster home. Of the four, all but D.S. remain there.

[8]     Between May 2018 and November 2019, eleven progress hearings were held. At or before each hearing, CPS filed reports with the court, providing updates on the children's evolving situations, Mother's visitations with the children, and her progress in fulfilling the service plan agreement. Mother was present for most of these hearings; A.H. went to several. At the hearing in January 2019, he asked that his children be placed with a sister, and the court instructed him to provide his attorney with her contact information. After that hearing, the CPS worker who attended noticed Mother outside; she had missed the hearing because public transit was late. Mother identified A.H.'s relative as a half-sister and indicated that she did not agree to this placement.

[9]     Mother's service plan agreement was originally due to end in June 2019 but was extended to September 2019. In a report filed before a November 2019 progress hearing, CPS stated that minimal progress was being made by Mother in fulfilling her service plan agreement, and that the agency believed that she would not make further progress. CPS recommended the court consider a permanency plan. The court ordered the plan to be filed and that the Attorney General's Office move for permanency.

**[10]**    CPS filed the initial permanency plan in December 2019.  The plan stated that both parents had been given an opportunity to provide CPS with family members who might serve as caregivers for the children, that A.H. had mentioned such a family member, that contact information for this individual had not been provided, and that Mother opposed this person becoming a caregiver.  Mother mentioned a relative in court but never provided contact information.  Because the parents could not provide a safe, stable, and nurturing home, CPS recommended the children remain with their current placements until full legal guardianship or adoption could be granted.

**[11]**    A.H. objected, arguing no plan should be finalized until he had the opportunity to prove himself innocent of the charges against him.  A month later, A.H. provided the court with contact information for his half-sister and a cousin.  He later emailed CPS to provide contact information for two nieces, a nephew, and another cousin.

**[12]**    In December 2020, A.H. was found guilty of Third Degree Criminal Sexual Conduct and of Terrorizing.[2]  CF0133-18-02 (Judgment at 2 (Apr. 14, 2021)).  After his conviction but before entry of judgment, an Amended Permanency Plan was completed and filed along with a corresponding notice and motion.  The amended plan recommended that S.S. (Older), R.H., and J.S. be adopted by their foster family and that S.S. (Younger) separately be adopted by hers.  Because of an accumulation of behavioral problems making adoption of D.S. impracticable, the amended plan recommended that D.S. be placed under long-term foster care unless adoption or legal guardianship could be arranged.  It was recommended that Mother visit with the children, but that A.H. have no contact after his parental rights were terminated.

---

[2] On December 19, 2022, the Government filed a request that we take notice of these convictions.  "Generally, the court may take judicial notice of court records."  *DFS Guam L.P. v. A.B. Won Pat Int'l Airport Auth.*, 2020 Guam 20 ¶ 13 n.4.  We do so here.

[13]     A.H. again objected to the plan, arguing that because he still had pending criminal cases, a permanency plan should not be finalized.  He also argued the plan did not properly consider possible placements with his family members.

[14]     In April 2021, A.H.'s remaining cases were resolved when he pleaded guilty to First Degree Criminal Sexual Conduct against S.S. (Older) and to Fourth Degree Criminal Sexual Conduct.  He stipulated to a sentence of seventeen years with credit for roughly three years of time served.

[15]     In March, April, and July 2021, the court held permanency hearings, at which the Attorney General's Office argued for adoption of the Amended Permanency Plan.  Mother was summoned and served by publication but did not attend.  A.H. argued he had been denied services because of his pretrial confinement and urged the court to place his children with family in Guam or Chuuk.  A CPS social worker assigned to the case testified that she had contacted the family members for whom A.H. had provided information, but that none had called her back to arrange custody of the children.

[16]     In March 2022, the Family Court issued its Findings of Fact and Conclusions of Law.  It found, by clear and convincing evidence, that neither Mother nor A.H. could provide the children with a safe, loving, and nurturing home, and that it was not reasonably foreseeable that they could do so within a reasonable amount of time.  The court acknowledged that "usually placement with a family member is preferred over placement with a non-family member," but found by clear and convincing evidence it was not in the best interests of A.H.'s children to be placed with his family.  Record on Appeal ("RA"), tab 135 at 10-11 (Mar. 4, 2022).  It found the Amended Permanency Plan to be in the best interests of all the children and adopted the entire plan, terminating both parents' parental rights.  A.H. timely appealed.

**[17]**    A.H. asks that this court to reverse the trial court's decision and return the matter with instructions to CPS to place the children with a family member or in a guardianship proceeding that will not terminate his parental rights.

## II.  JURISDICTION

**[18]**    This court has jurisdiction over an appeal from an order or decree of the Family Division taken by an interested party aggrieved by that order or decree.  19 GCA § 5125(a) (2005); 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 118-21 (2023)).

## III.  STANDARD OF REVIEW

**[19]**    "This court reviews jurisdictional questions *de novo*."  *In re Guardianship of Moylan*, 2018 Guam 21 ¶ 7.

**[20]**    On appeal from a termination of parental rights, we review the findings of fact made by the Family Court for clear error, with due regard given to the trial court's opportunity to judge the witnesses' credibility.  *Coffey v. Gov't of Guam*, 1997 Guam 14 ¶ 6; *In re N.A.*, 2001 Guam 7 ¶¶ 66-67.  "[W]hether a constitutional right has been violated is reviewed *de novo*."  *Coffey*, 1997 Guam 14 ¶ 6 (citing *United States v. Michael R.*, 90 F.3d 340, 343 (9th Cir. 1996)).

## IV.  ANALYSIS

### A.  The Family Court Order Is Appealable to the Guam Supreme Court by Statute

**[21]**    The Government argues a Family Court referee is properly understood as a "master," and that the Guam Rules of Civil Procedure ("GRCP") therefore dictate how a party should challenge a referee's orders.  Appellee's Br. at 33 (Dec. 19, 2022).  It argues GRCP 53 requires an objection to be filed with the Superior Court within twenty days of an order being served, and that failure to do so is effectively consent to the order.  *Id.* at 33-34.  Since A.H. immediately appealed to the Supreme Court, the Government argues he has waived appellate review.  *Id.* at 34.

[22]    If this court were to adopt the Government's line of reasoning and treat the Family Court referee as a special master, it would also need to acknowledge that her appointment here did not follow the procedure described in GRCP 53, and this matter would need to be set aside to be handled by a properly appointed master. But this is an incorrect understanding of the referee's position in Guam's judicial system. The Family Court referee is not a special master appointed according to GRCP 53, but a separate position within the Family Division of the Superior Court with an appointment process described by law. *See People v. Gomia*, 2017 Guam 13 ¶ 9; 19 GCA § 5113 (2005). As the Government's own brief acknowledges, 19 GCA § 5125 is the basis of this court's jurisdiction in this matter. Appellee's Br. at 2. That statute provides that an "interested party aggrieved by order or decree of the Family Division may appeal said order or decree to [the] Supreme Court of Guam." 19 GCA § 5125(a). A.H. properly appealed this matter.

## B.  A.H.'s Due Process Rights Were Not Violated When He Did Not Receive Services During His Incarceration

[23]    "Fourteenth Amendment Due Process is incorporated into Guam law through the Organic Act." *Taitano v. Calvo Fin. Corp.*, 2009 Guam 9 ¶ 9 n.2 (citing 48 U.S.C.A. § 1421b(u)); *see also Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1370 (9th Cir. 1992), *as amended* (June 8, 1992) ("The Mink Amendment . . . expressly extends to Guam the Due Process Clause of the Fourteenth Amendment . . . ."). A natural parent has a fundamental liberty interest, protected by the Constitution, in the companionship, care, custody, and management of their child. *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Palomo v. Bustamante*, 2019 Guam 5 ¶ 41 (per curiam) ("[T]he right to parent is a fundamental liberty interest protected by the [D]ue [P]rocess [C]lause of the Fourteenth Amendment . . . ." (alterations in original) (quoting *Coffey*, 1997 Guam 14 ¶ 7)).

[24]    A.H. has argued in broad terms that his due process rights were trampled because "the court could have ordered a permanent guardianship instead of terminating [his] parental rights," and

"[b]ecause the court and CPS did not make viable attempts to place the minors herein in a family placement, and did not offer any services to [A.H.]." Appellant's Br. at 12 (Nov. 7, 2022). "In terms of basic jurisprudence, a claim of 'constitutional due process violation' presents several complex conceptual issues," including whether the alleged violation was substantive or procedural, yet A.H. has "fail[ed] to provide this [c]ourt with any cogent legal or constitutional analysis to support this argument." *See Moore v. Hoffman*, No. CV 95-00033A, 1996 WL 104534, at *2 (D. Guam App. Div. Mar. 6, 1996), *aff'd*, 113 F.3d 1242 (9th Cir. 1997); *In re Guardianship of Moylan*, 2017 Guam 28 ¶ 36 ("[Appellant] provides no legal authority for this proposition and fails to articulate his theory of a due process violation, including whether the purported violation is procedural or substantive."). We decline to consider the mere allegation that somehow A.H.'s substantive due process rights have been violated, and instead only analyze his arguments on procedural grounds. *See Moore*, 1996 WL 104534, at *2.

### 1. A service plan is not required by statute

[25] A.H. argues his due process rights were violated because the Child Protective Act ("CPA") mandates CPS and the Family Court "attempt[] to see what services would be available to [him], while he was incarcerated." Appellant's Br. at 11. Specifically, he urges this court to overturn our decision in *Coffey v. Government of Guam*, 1997 Guam 14, where we held that provision of a service plan is not statutorily required. Appellant's Reply Br. at 2 (Jan. 17, 2023).[3]

[26] "A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls

---

[3] A.H. raises several issues for the first time in his reply brief. He alleges the proper procedure would have been to hold a fact-finding hearing within 30 days of him declining to admit the allegations in the PINS petition. Reply Br. at 1. He also argues that CPS, in failing to do its statutory duty, denied him, as an incarcerated person, equal protection of the law. *Id.* at 4. "The general rule is that issues raised for the first time in a reply brief are deemed waived." *In re Est. of Concepcion*, 2003 Guam 12 ¶ 10. As such, we decline to address these arguments.

short of standards derived from the Due Process Clause." *Mangels v. Pena*, 789 F.2d 836, 838-39 (10th Cir. 1986) (citations omitted); *see also Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015), *as amended on denial of reh'g & reh'g en banc* (Jan. 29, 2016) ("Once a substantive right has been created, 'it is the Due Process Clause which provides the procedural minimums, and not a statute or regulation.'" (citing *Geneva Towers Tenants Org. v. Federated Mortg. Invs.*, 504 F.2d 483, 491 n.13 (9th Cir. 1974))). Where a statute, rule, or regulation contains adequate procedural safeguards, adherence to it satisfies due process. *Cf. Carlson v. Perez*, 2007 Guam 6 ¶ 37 ("[G]iven the . . . procedural safeguards contained within the [Civil Service Commission] Rules . . . due process was satisfied when . . . the CSC adhered to the CSC Rules."); *People v. Santos*, 1999 Guam 1 ¶ 20 (stating that "trial courts may employ the procedural safeguards of the Rules of Evidence" to satisfy the requirements of due process during a suppression hearing); *People v. Camacho*, 2009 Guam 6 ¶¶ 28, 44 (finding trial court properly revoked probation where it followed statute that "codified the due process requirements for probation revocation"). We have previously held the "procedural safeguards" contained in the CPA to be constitutionally sufficient. *See Coffey*, 1997 Guam 14 ¶ 7 (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982)).

[27]     When interpreting statutes, we "must give the statute a meaning consistent with the plain meaning of the words used and the legislative intent." *People v. Quichocho*, 1997 Guam 13 ¶ 15. "In determining the plain meaning of a statutory provision, we look to the meaning of the entire statutory scheme containing the provision for guidance." *Amerault v. Intelcom Support Servs., Inc.*, 2004 Guam 23 ¶ 14. "The principle of *stare decisis* has special force in respect to statutory interpretation because [the legislature] remains free to alter what we have done." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 274 (2014) (quoting *John R. Sand & Gravel Co. v.*

*United States*, 552 U.S. 130, 139 (2008)) (internal quotation marks omitted). This is true "especially when a unanimous interpretation of a statute has been accepted as settled law for several decades." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 32 (2005). Statutory precedent is properly challenged if "its justification was 'badly reasoned' or . . . the rule has proved to be 'unworkable.'" *Pearson v. Callahan*, 555 U.S. 223, 234 (2009); *see also Tansavatdi v. City of Rancho Palos Verdes*, 527 P.3d 873, 887 (Cal. 2023) ("'[A] party urging us to overrule a precedent faces a rightly onerous task.' That burden is even greater where . . . 'the Court is asked to overrule a point of statutory construction.'" (citations omitted)).

[28] The governing legislation here is the CPA, which provides CPS's statutory mandate. *See* 19 GCA §§ 13100-13509 (as amended by Guam Pub. L. 36-040 (July 20, 2022)). CPS is obligated to investigate reports of child abuse or neglect "for the purpose of providing protective services to prevent further abuses to children." 19 GCA § 13301(a)-(b). Section 13301(d) requires CPS to make available certain delineated services, but it "does not make specific mention of a service plan per se." *Coffey*, 1997 Guam 14 ¶ 24; 19 GCA § 13301(d). When CPS decides to act, it shall:

(1) Resolve the matter in such informal fashion as is appropriate under the circumstances;

(2) Seek to enter into a service plan, without filing a petition in court, with such members of the child's family and such other authorized agencies as Child Protective Services deems to be necessary to the success of the service plan, including but not limited to the member or members of the child's family who have legal custody of the child;

(3) Assume protective custody of the child pursuant to § 13302;

(4) File a petition; or

(5) Relinquish its protective custody and return the child to his or her legal custodian.

19 GCA § 13301(c).

[29]     The plain language of 19 GCA § 13301(c) belies A.H.'s assertion that a service plan is a statutory requirement.  The disjunctive "or" indicates that a service plan is one course of action that CPS may pursue after a finding that a child has been harmed or is subject to harm, but CPS need not provide a service plan so long as one of the other courses of action is pursued.  *Cf. Camacho v. Est. of Gumataotao*, 2010 Guam 1 ¶ 18 ("The plain language of [the statute] likewise belies the [appellants]' assertion . . . .  This disjunctive "or" indicates that meeting the qualifications . . . and being appointed . . . are two different things.").  After "satisfying itself as to the course of action to be pursued," CPS complied with the statute by filing a PINS petition.  *See* 19 GCA § 13301(c).

[30]     In *Coffey*, we interpreted sections 13304 and 13301 to reach the conclusion that "there is no mandatory language in the CPA requiring that a service plan be implemented."  1997 Guam 14 ¶ 24.  A.H. has neither shown how this interpretation was "badly reasoned" nor shown that the rule has proved to be "unworkable."  *See Pearson*, 555 U.S. at 234.  He first points to 19 GCA § 13304(e),[4] which he asks us to reinterpret anew.  Reply Br. at 2.  Although "*[s]tare decisis* is . . . a flexible policy 'which permits this court to reconsider, and ultimately to depart from, our own prior precedent in an appropriate case,'" *Leon-Guerrero v. Gov't of Guam*, 2022 Guam 5 ¶ 12 (quoting *Duenas v. Brady*, 2008 Guam 27 ¶ 17 n.4), we will not reinterpret a statute every time we are confronted with it in a different case, *see Kehaya v. United States*, 355 F.2d 639, 641 (Ct. Cl. 1966).  Implicit in our holding that "there is no mandatory language in the CPA requiring that a service plan be implemented" is a recognition that although a service plan may precede a PINS

---

[4] Section 13304(e) states that if a child's family member whom CPS deems necessary to the success of a service plan "cannot or does not understand or agree to the terms and conditions set forth in the service plan, [CPS] shall proceed pursuant to § 13305."  Section 13305 in turn describes the requirements of a PINS petition.

petition, it is not a prerequisite to filing a petition.[5] *See Coffey*, 1997 Guam 14 ¶ 24. We see no reason to depart from *Coffey*, as section 13304 did not require a service plan be implemented before the petition was filed in this case.

[31]     A.H. also suggests 19 GCA § 13309 as the statutory basis for a mandatory service plan requirement. Reply Br. at 2-3. This provision requires CPS to make every reasonable effort to submit written reports to the court or to explain why such reports are not being submitted timely. 19 GCA § 13309(a). A.H. calls our attention to 19 GCA § 13309(b)(2)(A), which applies in proceedings after adjudication; it requires a report to be filed at each such proceeding, recommending a service plan or revisions to the existing service plan. Reply Br. at 2-3. If this provision stood alone, A.H.'s argument might have merit. But this provision is also plainly disjunctive. The report must recommend a service plan *or* "[a]n award of permanent custody." 19 GCA § 13309(b)(2)(A)-(B). Thus, CPS is not required to recommend a service plan because it may instead recommend an award of permanent custody, as it did here.

[32]     We decline to overturn *Coffey*. A service plan is one course of action that CPS can pursue, but the statute does not require one.

### 2. The CPA does not require all parents be presented with any service plan that is issued

[33]     CPS ultimately did create a service plan, but because A.H. asked to be excused from proceedings until his court cases were resolved, it only did so for Mother. In directing our attention to 19 GCA §§ 13301(c)(2) and 13304(e), A.H. seems to imply that he is a necessary recipient of any service plan issued. Reply Br. at 2-3. This presents a pure question of statutory interpretation that we review *de novo*. *See Port Auth. of Guam v. Civ. Serv. Comm'n (Javelosa)*, 2018 Guam 9

---

[5] Indeed, in most cases a service plan follows a PINS petition. But neither order of operations is statutorily mandated by the CPA, nor is either forbidden.

¶ 12; *Fagan v. Dell'Isola*, 2006 Guam 11 ¶ 10 ("The court always reviews questions of law *de novo*.").

**[34]**     Again, we look to the plain meaning of the statutes.  *Quichocho*, 1997 Guam 13 ¶ 15. Section 13301(c) provides CPS with several courses of action it may pursue if there is harm or risk of harm to a child.  One such course of action is a service plan, the goal of which is "to facilitate the return of the child to a safe family home," to allow the child to remain in a safe family home, and to terminate the intervention of CPS.  19 GCA § 13304(b)(1)-(3).  In detailing how CPS should enter into a service plan, the statute provides that it must do so "with such members of the child's family and such other authorized agencies as Child Protective Services deems to be necessary to the success of the service plan, including but not limited to the member or members of the child's family who have legal custody of the child."  19 GCA § 13301(c)(2).  Similarly, a service plan is statutorily defined as:

> a specific written plan prepared by Child Protective Services and presented to such members of the child's family as Child Protective Services deems to be necessary to the success of the plan, including, but not limited to, the member or members of the child's family who have legal custody of the child at the time that the service plan is being formulated or revised . . . .

19 GCA § 13304(a).

**[35]**     A plain reading of these statutory provisions provides that CPS should present a service plan to members of the child's family that it deems necessary to the plan's success, "including, but not limited to" those who have legal custody of the child.  The phrase "including, but not limited to" is ambiguous because it is "susceptible to two or more reasonable interpretations."  *Halversen v. Allstate Prop. & Cas. Ins. Co.*, 2021 UT App 59 ¶ 9, 493 P.3d 693 (citation omitted); *see also Leon Guerrero v. Leon Guerrero*, 2014 Guam 6 ¶ 18 (finding phrase in stipulated judgment unambiguous because it "supports only one reasonable interpretation"); *cf. Bank of Guam v.*

*Flores*, 2004 Guam 25 ¶ 14 ("A contract is ambiguous when, on its face, it is capable of two different reasonable interpretations." (citation omitted)). From the language of the statute, it is reasonable to read this provision as granting CPS full discretion to decide who is necessary to the success of the plan, that category possibly but not necessarily including those with legal custody of the child. *Cf. People v. Zeigler*, 149 Cal. Rptr. 3d 786, 804-05 (Ct. App. 2012) (interpreting statute that provided "[t]he court . . . *may* require such testimony as it deems necessary, . . . including [a list of records]" to mean "[t]he court may, but is not required to, order the production of the records listed in [the statute]"). But it is also reasonable to read the statute as requiring, at a minimum, that those with legal custody[6] be included in any service plan.

[36]    We look then to legislative intent. *People v. Rios*, 2008 Guam 22 ¶ 13. The policy and purpose of the CPA "are to provide children with prompt and ample protection . . . with an opportunity for timely reconciliation with their families where practical." 19 GCA § 13100. The legislation "shall be liberally construed to serve the best interests of the children and the purposes set out in [the] Chapter." *Id.*

[37]    As discussed, one key purpose of a service plan is to return the children to a safe family home. 19 GCA § 13304(b)(1). The individuals necessary for the success of that goal will vary and may not include those with legal custody. In some circumstances, those with legal custody of minor children are difficult to locate, uninterested in a service plan, or, as here, unable to contribute to that purpose. We read statutes to avoid "absurd or impractical consequences, untenable

---

[6] Generally, legal custody is held by a child's "parents." *See* 19 GCA §§ 4202(i), 4302(a) (2005). Title 19 of the Guam Code Annotated defines "parent" to include "the father as to whom a child is legitimate" or "a person as to whom a child is presumed to be a legitimate child." 19 GCA § 4202(g)(2)-(3); *see also id.* § 4302(a). It is unclear from the record if A.H. was married to Mother, so it is impossible to determine with certainty whether the children were presumed to be legitimate or if A.H. took the steps necessary to legitimate them. He is called Mother's "husband" in the Amended Permanency Plan and in the Government's opposition brief. RA, tab 110, Ex. A at 2 (Am. Notice of Mot. & Mot., Feb. 11, 2021); Appellee's Br. at 3 (Dec. 19, 2022). Since the point was not litigated, we assume here that A.H. had legal custody until the termination of his parental rights.

distinctions, or unreasonable results." *Sumitomo Constr., Co. v. Gov't of Guam*, 2001 Guam 23 ¶ 17 (citation omitted). To require CPS to locate and involve such people would be both unreasonable and impractical, wasting limited resources. A reading that grants CPS discretion to consider who is necessary to a service plan, rather than mandating who must be included in the plan, advances the CPA's purpose more effectively.[7] *See* 19 GCA § 13100. If something else were intended, it is the role of the Legislature to clarify the statute accordingly.

[38] This reading of the statute is not violative of A.H.'s rights. A.H. contends his right against self-incrimination should outweigh the need for him to participate in a PINS proceeding admitting or denying wrongdoing. Reply Br. at 1. We infer from this contention that A.H. believes he was unjustifiably punished for exercising his right against self-incrimination when he was denied services following his request for exclusion. But 19 GCA § 13311(a) provides that any testimony or evidence a party produces in a child protective proceeding "may be ordered by the court to be inadmissible as evidence in any other territorial civil or criminal action or proceeding, if the court deems such an order to be in the best interests of the child." A.H. need not have excluded himself from proceedings to avoid self-incrimination, so this right was not at issue.

[39] Furthermore, our reading does not conflict with A.H.'s due process rights. Before parental rights are terminated, certain procedural safeguards must be afforded. Our reading of the statute

---

[7] Our conclusion that *I Liheslaturan Guåhan* did not intend to require parents be included in all service plan agreements is further supported by the Legislature's subsequent amendment of the CPA to negate any requirement that CPS make reasonable efforts to reunify a parent with a child when the parent has subjected the child to aggravated circumstances such as sexual abuse. 19 GCA § 13301.2(a)(1) (added by Guam Pub. L. 36-135 (Dec. 28, 2022)). Although Public Law 36-135 was passed after the events of this case took place, "[t]here are no principles of construction which prevent the utilization by the courts of subsequent enactments or amendments as an aid in arriving at the correct meaning of a prior statute . . . ." *Jenkins v. Montallana*, 2007 Guam 12 ¶ 19 (citation omitted). We note that this amendment to the CPA does not apply to A.H., and our opinion addresses the pre-amendment version of the CPA. However, the argument that a person with legal custody is required to be presented with a service plan for reunification even when the person has committed egregious acts against a child is unlikely to arise again.

does not negate that requirement. A service plan agreement is simply not among the procedural safeguards a party is guaranteed by the Constitution to protect his liberty interest.

[40]    Thus, we find that CPS's decision not to include A.H. in the service plan was supported by law, so long as it also found that he was unnecessary to its success. Because A.H. could not contribute to the return of the children to a safe family home during his incarceration, CPS's determination is supported in the record. If he had been denied a service plan after his release, the analysis might have been different, but that is not this case. CPS acted properly.

## C. A.H. Was Provided Due Process Before His Parental Rights Were Terminated

[41]    A.H. argues the court could have ordered permanent guardianship rather than terminating his parental rights. Appellant's Br. at 12. He contends that, for his rights to be terminated, it must first be established that "there is no less drastic action that can be taken." *Id.* at 7.

[42]    Case law has established that the right to parent is a "fundamental liberty interest" protected by the Fourteenth Amendment, and that this right is afforded great protection from state interference. *Coffey*, 1997 Guam 14 ¶ 7 (citing *Santosky*, 455 U.S. at 753-54). "Notice and an opportunity to be heard are necessary before parental rights can be terminated." *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) (quoting *Huynh Thi Anh v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978)). "However, the state's interest may prevail under certain circumstances. The CPA governs areas of abuse or neglect of children and, although reunification is a goal of the CPA, ultimately what is sought to be effectuated is the best interest of the child." *Coffey*, 1997 Guam 14 ¶ 7. Procedural safeguards balance the "parent's rights and the state's interest in protecting children." *Id.* One such safeguard is that before terminating parental rights, it must "be established by clear and convincing evidence that a home is unsafe and it is not reasonably foreseeable it will become safe." *Id.*; *see also* 19 GCA § 13324.

[43]    Here, the Family Court held eleven progress hearings between May 2018 and November 2019.  A.H. does not dispute that he had notice of these hearings.[8]  Nor does A.H. dispute his presence at all three permanency hearings.

[44]    A.H. had the opportunity to be heard at every progress hearing, though in most cases he chose not to be.  He personally testified at the July 2021 permanency hearings.  He was also represented by counsel, who presented evidence and cross-examined witnesses at the permanency hearings.

[45]    The Family Court applied the clear and convincing evidentiary standard in finding that A.H. pleaded guilty to the sexual assault of S.S. (Older) and to other sexual violations, and that it was not in the best interests of the children to have contact with him.  RA, tab 135 at 10 (Finds. Fact & Concl. L., Mar. 4, 2022).  It also found, by clear and convincing evidence, that he was "not presently willing and able to provide his children with a safe, loving and nurturing home . . . and that further, it [was] not reasonably foreseeable that he [would] become willing and able [to do so] within a reasonable amount of time."  *Id.*  It found by clear and convincing evidence that the Amended Permanency Plan, which recommended D.S. be placed into long-term foster care, and that the other children be adopted by the foster families with whom they were placed, was in the children's best interests.  *Id.* at 11.  These findings are supported by the record, and we do not find them to be clearly erroneous.  *See In re N.A.*, 2001 Guam 7 ¶ 72.

[46]    A.H. has failed to provide legal authority supporting his claim that before terminating his parental rights, the court must establish that no less drastic action can be taken instead.  *See People v. Orallo*, 2006 Guam 8 ¶ 8 & n.1 (stating that where appellant "failed to offer any legal authority to support his contention," his arguments were "not only unpersuasive, but border on being

---

[8] We observe that A.H.'s attorney was present at the December 2018 hearing, while A.H. himself went to those held in January, June, August, and November 2019.

frivolous"). The paramount concern in permanency proceedings is the best interests of the children, and the court adhered to the requirements of due process in pursuing those interests.

[47] The Family Court went beyond the minimum process requirements provided by statute, which we have held provide constitutionally adequate safeguards. *See Coffey*, 1997 Guam 14 ¶ 7. The law at the time allowed the Family Court to begin permanency proceedings at any time upon determining that the family home was not safe, but it required the Family Court to do so if the child had been residing outside the family home for two years. 19 GCA § 13320(e) (2005).[9] The court duly ordered CPS to file a motion for permanency by December 12, 2019, but it did not begin the permanency hearings or make any final decisions until after A.H.'s convictions more than a year later in March 2021.

[48] The Family Court followed all statutory and constitutional requirements before rendering its decision. A.H. had notice of all hearings affecting his substantial rights, along with the opportunity to be heard. He was adequately represented by counsel. The Family Court applied the correct evidentiary standard in determining the best interests of the children. A.H.'s due process rights were not violated, and the termination of his parental rights is affirmed.

## D. Placement of the Children with Nonrelatives Did Not Violate Due Process

[49] A.H. argues his due process rights were violated because CPS did not seek to place the children with his relatives, and because it made limited attempts to communicate with those relatives. Appellant's Br. at 12. He urges that there is no clear and convincing evidence that attempts were made to place the children with a relative. *Id.* at 9. His argument seems to be that due process required the children's placement with his family members, allowing for a situation where his parental rights were not completely terminated.

---

[9] This provision has since been amended to shorten the mandatory time to one year. Guam Pub. L. 36-135:8 (Dec. 28, 2022).

[50]     There are no due process rights implicated in the placement of A.H.'s children with nonrelatives which are not also implicated in the termination of his parental rights.  The placement decision was made after the same process.  Therefore, the above analysis on provision of notice, an opportunity to be heard, and the clear and convincing evidentiary standard also applies to the placement of the children.

[51]     A.H.'s contention that clear and convincing evidence of an attempt to place the children with a relative is a necessary step before their permanent placement misstates the law.  The court must "consider fully all relevant prior and current information for determining whether the child's family is willing and able to provide the child with a safe family home."  19 GCA § 13324(a) (2005).[10]  Before implementing a permanency plan, it must find by clear and convincing evidence that: (1) the child's family is not presently willing and able to provide a safe family home; (2) it is not reasonably foreseeable that the family will become willing and able to provide such a home; and (3) the proposed permanency plan is in the best interests of the child.  19 GCA § 13324(a)(1)-(3), (b)(3).  There is no requirement that an attempt to place a child with a relative be shown by clear and convincing evidence.  It is evident from its Findings of Fact that the court properly considered three years' worth of reports from CPS, as well as testimony from a healthcare provider and social workers with personal knowledge of the case.  RA, tab 135 at 2-9 ¶¶ 13-37, 52-56, 58-60, 61-63 (Finds. Fact & Concl. L.).  The court likewise made the required findings.  As discussed above, these findings are supported in the record, and so are not clearly erroneous.  *See In re N.A.*, 2001 Guam 7 ¶ 72.

[52]     "Reunification of the family is a policy goal of the CPA . . . ."  *Coffey*, 1997 Guam 14 ¶ 21.  "Generally, placement with a family member is preferable to placement with a nonrelative."

---

[10] Title 19 GCA § 13324 was also among the provisions amended in December 2022.  The citations in this opinion reflect that provision as it was codified during proceedings in the Family Court.

*In re J.L.L.P.*, 2004 Guam 3 ¶ 21 (citing 19 GCA § 9108(c) (1993)).  However, "[w]here a parent is not attempting to gain custody himself, 'the preference to which any other applicant for appointment may be entitled must yield to the paramount consideration—the interest and welfare of the child.'"  *Id.* ¶ 22 (quoting *In re Guardianship of Aviles*, 284 P.2d 176, 178-79 (Cal. Dist. Ct. App. 1955)).  "The concerns involved in removing a child from a person's custody are inherently different from those involved in an initial award of custody."  *Id.* ¶ 21.

[53]    At the time of the Family Court's adoption of the permanency plan, A.H.'s three biological children had been living with their foster families for more than two years.  Although initial placement with a family member may have been preferable in this case,[11] A.H. sought to remove the children from the care of their foster families.  This involved inherently different concerns and required A.H. to present evidence that it was no longer in the children's best interests to continue to remain with their foster families.  *See In re J.L.L.P.*, 2004 Guam 3 ¶¶ 21-22.

[54]    A.H. provided CPS and the court with contact information for his half-sister as well as several of his nieces, nephews, and cousins prior to the permanency hearing.  But 19 GCA § 13317(d)(2) requires not only that the names and contact information of potential foster parents be provided, but also that the party arrange for their appearance in court.  A.H. did not arrange for

---

[11] A.H. also argues the statutory definition of family is poorly applied to his own children, who come "from a small island, where familial relations are much closer than those in western society."  Reply Br. at 4.  "Family" is defined by statute to mean:

> [E]ach legal parent, the grandparents, each parent's spouse, each sibling or person related by consanguinity up to the second degree or by marriage, each person residing in the same dwelling unit, and any other person or legal entity which is a child's legal or physical custodian or guardian, or who is otherwise responsible for the child's care[.]

19 GCA § 13101(n).  Before the permanency hearings, A.H. provided CPS and the court with contact information for several individuals, including nieces, nephews, cousins, and his half-sister.  The only person suggested by A.H. with a second-degree relation to the children was his mother, but this was not until late in the proceedings.  Even if we were to assume that the individuals suggested by A.H. were "responsible for the child[ren]'s care," 19 GCA § 13101(n), his argument is unavailing because any preference they were entitled to was required to yield to the best interests of the children; *see In re J.L.L.P.*, 2004 Guam 3 ¶¶ 21-22.  At any rate, we believe the statutory definition is broad enough to respect non-Western family structures.

any family member's appearance. In any case, none of these individuals has been shown to meet the statutory definition of family. *See* 19 GCA § 13101(n).

[55]    A.H. contends that his half-sister did eventually confirm her ability to take the children, but this was not until after the permanency hearings had been completed. Emails from a CPS case worker indicate that when A.H. provided her information, his half-sister was contacted and asked to call back but never did. Moreover, Mother said she did not agree to the children being placed in A.H.'s half-sister's home. The children's foster families have shown a willingness and ability to care for them. Contrasting this with A.H.'s half-sister, it is hard to imagine that the children would be better off in a placement of which Mother did not approve and with an individual who, from the record, does not appear to have expressed any interest in assuming their care.

[56]    A.H. also raised the possibility of the children being placed with their grandmother in Chuuk, though this came late in the proceedings at the final permanency hearing. The pursuit of the best interests of the child does not necessarily require placement in the home with the greatest material comfort. *See, e.g.*, *Gutierrez v. N.M. Dep't of Pub. Welfare*, 1964-NMSC-129, ¶ 16, 74 N.M. 273, 393 P.2d 12 ("In an adoption proceeding, the welfare and best interest of a child are not measured altogether by material and economic factors, parental love and affection must find some place in the scheme."). However, the record does not reveal why this suggestion came so late, nor does it have any details about the grandmother's willingness to accept the children or of the home she could provide. Likewise, the record is silent on her interest and the quality of care she could provide.

[57]    At best, A.H. presented evidence that suggested the existence of relatives that may or may not have been amenable or able to provide a home for the children. But this falls well short of the required showing that it was in the children's best interests to be removed from their foster

placements. Here, in the absence of any evidence that the continued placement of the children with their foster families was not in their best interests, the Family Court determined that the dispositions in the Amended Permanency Plan were in the best interests of the children.

[58] The Family Court did all that was statutorily and constitutionally required of it before permanently placing the children. It considered all relevant information to make the required findings. It applied the correct evidentiary standard. Its findings are supported by the record. We affirm its decision.

## V. CONCLUSION

[59] The Family Court referee who presided over this case is not a special master but rather holds a separate position within the Superior Court with an appointment process described by law. This court has jurisdiction over appeals from an interested party aggrieved by an order or decree of the Family Division. CPS was not required by statute to issue a service plan agreement to A.H., and its decision not to do so did not violate A.H.'s due process rights. A.H. received notice of all hearings about his parental rights. He had an opportunity to be heard, both personally and through counsel. The Family Court applied the correct standard of evidence in reaching its decisions. A.H. was given all the process he was due when his parental rights were terminated. Though placement with family members is generally preferred, the best interests of the child are paramount. The Family Court's finding that the Amended Permanency Plan was in the children's best interests was supported by findings of fact that are not clearly erroneous. For these reasons, we **AFFIRM**.

|  |  |
|---|---|
| /s/ | /s/ |
| F. PHILIP CARBULLIDO | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
ROBERT J. TORRES
Chief Justice